UNITED STATES of America, Appellee,

v.

Thomas F. JOHNSON, J. Kenneth Edlin, and William L. Robinson, Appellants.

No. 9223.

United States Court of Appeals Fourth Circuit.

Argued April 16, 1964.

Decided Sept. 16, 1964.

Certiorari Granted Jan. 25, 1965.

See 85 S.Ct. 703.

318 F.2d 545, 549 (5th Cir. 1963) "Respondent was not required to await diminution of business before acting."

184

George Cochran Doub, Baltimore, Md. (Weinberg & Green, Baltimore, Md., on brief), for appellant Thomas F. Johnson.

William L. Robinson, pro se.

Eugene Gressman and Edward L. Genn, Washington, D. C. (Brown, Genn & Brown, Washington, D. C., on brief), for appellant J. Kenneth Edlin.

J. Hardin Marion, III, Special Asst. U. S. Atty., and Arthur L. Burnett, Attorney, Department of Justice (Robert W. Kernan, First Asst. U. S. Atty., and David Ellenhorn, Attorney, Department of Justice, on brief), for appellee.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and BUTZNER, District Judge.

SOBELOFF, Chief Judge.

Two members of the United States Congress and two other persons were jointly indicted for violations of both the conspiracy statute, 18 U.S.C.A. § 371, and the conflicts of interest statute, 18 U.S.C.A. § 281.[1] After a jury trial the four defendants were convicted. One, Frank W. Boykin, a Representative from Alabama, paid his fine and has not appealed. This is the appeal of Representative Thomas F. Johnson of Maryland, and J. Kenneth Edlin and William L. Robinson.

The indictment was in eight counts. The first charged a conspiracy "to defraud the United States * * * (a) Of * * * its right to have * * * the official business of the Department. of Justice, conducted honestly * * *. (b) Of * * * its right to have * * personnel of the Department of Justice, free * * * of * * * unlawful, improper and undue pressure * * *. (c) Of * * * its right to have the lawful functions and duties of the defendants THOMAS F. JOHNSON and FRANK W. BOYKIN * * * free from corruption * * *. (d) Of * * its right not to be deprived of the faithful, loyal and conscientious services of the defendants THOMAS F. JOHNSON and FRANK W. BOYKIN * * *."[2] This count alleged that as part of the conspiracy Johnson was paid to make a speech in Congress and to persuade officials of the Department of Justice to cause the postponement and eventual dismissal of a criminal action then pending against Edlin.

The remaining seven counts charged Johnson with the substantive offenses of receiving payment for representing Edlin before the Justice Department. 18 U.S. C.A. § 281. In these counts Robinson and Edlin were charged as aiders and abettors.

## I. THE INDICTMENT

### A. FIRST COUNT—CONSPIRACY

The appellants attack the validity of count one on two broad fronts. First,. they say that in general conspiracy indictments should not be tolerated because of the abuses which they engender. Second, they contend that this particular

---

1. See pre-trial opinion of District Court, United States v. Johnson, 215 F.Supp. 300 (D.Md.1963).

2. Paragraph 14, subparagraphs (a) to (d) of the indictment.

indictment is defective in a number of ways.

### 1. Alleged Invalidity of Conspiracy Indictments

The appellants' criticism of conspiracy indictments is not wholly without foundation. They are not the first to express the view. Similar statements can be found in concurring and dissenting opinions in the Supreme Court and in a number of Law Review articles. Krulewitch v. United States, 336 U.S. 440, 445–448, 69 S.Ct. 716, 93 L.Ed. 790 (1949); Kotteakos v. United States, 328 U.S. 750, 760–774, 66 S.Ct. 1239, 70 L.Ed. 1557 (1946). Goldstein, "Conspiracy to Defraud the United States," 68 Yale L.J. 405 (1959). The dragnet effect of conspiracy indictments, their sometime indiscriminate use and the unfair advantage they may give to the prosecution in respect to evidence and proof are well known. While this is true, the Supreme Court has not said that conspiracy indictments as such are improper; convictions based upon them have been repeatedly upheld. The net effect of the Court's expressions of concern is an admonition to scrutinize carefully the allegations of such indictments and the proof adduced in their support.

### 2. Specific Attacks on First Count

#### a. Vagueness and indefiniteness

■ The appellants insist that count one is indefinite and vague and fails to inform them of the charge alleged. Our reading of the count does not confirm this contention. The count alleges a conspiracy "to defraud the United States." Subparagraphs (a) to (d) of paragraph 14, summarized above, enumerate four governmental functions and rights which are alleged to have been defrauded. It was not necessary to allege that the Government had been defrauded of money or property. Section 371 has consistently been interpreted to support an indictment charging that a lawful function of the Government has been interfered with or obstructed. Hammerschmidt v. United States, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924); Curley v. United States, 130 F. 1 (1st Cir.), cert. denied, 195 U.S. 628, 25 S.Ct. 787, 49 L.Ed. 351 (1904); Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910).

Paragraphs 15 to 25 of count one state the objects and purposes of the conspiracy. Thereafter 75 overt acts are alleged. Contrary to the appellants' contentions, the indictment did not give the Government carte blanche to introduce evidence and frame any imaginable purpose of the conspiracy. In plain and concise language the paragraphs 15 to 25 effectively define the objects and delineate the proof. This is all that Rule 7(c) [3] of the Rules of Criminal Procedure requires. See May v. United States, 175 F.2d 994 (D.C.Cir.), cert. denied, 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949); United States v. Manton, 107 F.2d 834 (2d Cir. 1938), cert. denied, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940).

#### b. Duplicity

■ Because count one alleges both Johnson's speech *and* his discussions with members of the Justice Department, the appellants maintain that it is duplicitous. The short and, we think, sufficient answer is that the indictment charges only one conspiracy—to defraud the United States—and this is not changed by the assertion of more than one means used to accomplish the object. "The conspiracy is the crime, and that is one, however diverse its objects." Frohwerk v. United States, 249 U.S. 204, 210, 39 S.Ct. 249, 252, 63 L.Ed. 561 (1919).[4]

#### c. Alleged insufficiency of allegations charging fraud

■ We must also reject the argument that count one was fatally defective because it failed to charge any false statement, misrepresentation or deceit.

---

3. "7(c) The indictment * * * shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. * * *"

4. See also United States v. Manton, supra, and May v. United States, supra, where the same contention was raised and rejected.

In Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924), the Supreme Court defined the word "defraud" as used in what is now section 371:

"To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, *or at least by means that are dishonest.*" (Emphasis added.)

Since Hammerschmidt, numerous cases have held that the payment of money by a private person to an official of the Government for the performance of an official act constitutes a fraud. United States v. Manton, supra; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); May v. United States, supra; United States v. Bowles, 183 F.Supp. 237 (S.D.Me.1958). Glasser really closed the debate. There the Court, citing Hammerschmidt, said:

"The indictment charges that the United States was defrauded by depriving it of its lawful governmental functions by dishonest means; it is settled that this is a 'defrauding' within the meaning of [section 371] of the Criminal Code." 315 U.S. at 66, 62 S.Ct. at 463.

The indictment in paragraphs 15 to 25 explicitly stated that it was a part of the conspiracy for appellant Johnson to receive compensation from appellants Edlin and Robinson. Manifestly this is a "dishonest means," in the Hammerschmidt phrase, and is sufficient to support an indictment under section 371.

d. *The alleged impossibility of defrauding the Justice Department*

■ Appellant Edlin contends that the conspiracy count must fail because it was impossible to defraud the United States in connection with the criminal charge pending against him. His position is that it was not within the power of the Department of Justice to effectuate a postponement of the trial or a dismissal of the indictment, because that power was solely in the court. The argument is specious: It is true that the court's consent would be required to dismiss a pending charge, Rule 48(a), Fed. R.Crim.P., but in a practical sense, as the Department is in charge of the prosecution, its decision to postpone a trial, or even to abandon a case, has great, if not decisive, influence with the court.

e. *Congressional privilege*

Appellant Johnson's principal contention is that insofar as the indictment questions his motivation in making a speech on the floor of the House, it contravenes Article I, section 6 of the Constitution.

"The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; *and for any Speech or Debate in either House, they shall not be questioned in any other Place.*" (Emphasis added.)

This is the first case, within our knowledge, squarely raising the question whether the congressional privilege deprives a court of jurisdiction to try a member on a criminal charge of accepting money to make a speech in the House of which he is a member.

The history of the parliamentary privilege is a long and turbulent one, developed in the course of conflict between Parliament and the Crown as to the proper subjects of discussion on the floor of Parliament.[5] The Crown asserted

5. See generally MAY, TREATISE ON THE LAW, PRIVILEGES, PROCEEDINGS AND USAGE OF PARLIAMENT (16th ed. 1957); WITTKE, THE HISTORY OF ENGLISH PARLIAMENTARY PRIVILEGE (Ohio State University 1921).

that matters then under debate in Parliament were within the King's prerogative, while Parliament insisted that it was protected by the privilege. Particularly disconcerting to the Crown was Parliament's intrusion into matters affecting the succession and into questions of religion. During the reigns of both Queen Elizabeth and James I the Crown resisted Parliament's expansion of its independence. More than once, members of Parliament were committed to the Tower.[6]

The accession of Charles I brought continued conflict.[7] In 1629 three members of the House of Commons, Sir John Elliot, Denzill Holles and Benjamin Valentine, when arrested and prosecuted for libelous and seditious speeches, pleaded to the jurisdiction of the court. They maintained that they were punishable, if at all, only in Parliament. The King's Bench rejected their plea and convicted them, Judge Sir William Jones observing: "We are the judges of their lives and lands; therefore of their liberties." 3 Howell, State Trials, 296, 306. The decision was very unpopular and contributed to the eventual downfall of Charles.[8]

Immediately after the Revolution of 1688, Parliament enacted the Bill of Rights containing the following declaration: "[T]hat the freedom of speech, and debates, and proceedings in Parliament, ought not to be impeached or questioned in any court or place out of Parliament." Since then the privilege of speech and debate has never been questiond or denied.

The scope of the privilege is demonstrated in the English case, Ex parte Wason, 4 Q.B. 573 (1869). There the English court held that a conspiracy by a number of persons, including members of the House of Lords, to make false statements in the House was not an offense at law, because the courts were powerless to question the motives and intentions of members when speaking before the Parliament.

In the landmark case of Stockdale v. Hansard, 9 Adolphus & Ellis 1 (1839), Lord Denman described the privilege, by then fully developed, in these words:

"The privilege of having their debates unquestioned, though denied when the members began to speak their minds freely in the time of Queen Elizabeth, and punished in its exercise both by that princess and her two successors, was soon clearly perceived to be indispensable and universally acknowledged. By consequence, whatever is done within the walls of either assembly must pass without question in any other place. For speeches made in Parliament by a member to the prejudice of any other person, or hazardous to the public peace, that member enjoys complete impunity. For every paper signed by the speaker by order of the House, though to the last degree calumnious, or even if it brought personal suffering upon individuals, the speaker cannot be arraigned in a court of justice. But if the calumnious or inflammatory speeches should be reported and published, the law will attach responsibility on the publisher. So if the speaker by authority of the House order an illegal act, though that authority shall exempt him from question, his order shall no more justify the person who executed it than King Charles's warrant for levying ship-money could justify his revenue officer."

Early in the history of the American colonies, the privilege of speech was recognized,[9] and many of them placed it in their constitutions when they achieved

---

6. TASWELL-LANGMEAD, ENGLISH CONSTITUTIONAL HISTORY FROM THE TEUTONIC CONQUEST TO THE PRESENT TIME, 249 (11th ed. 1960).

7. CHRIMES, ENGLISH CONSTITUTIONAL HISTORY, 151–53 (2d ed. 1953).

8. WITTKE, op. cit. supra, n. 5.

9. CLARKE, PARLIAMENTARY PRIVILEGE IN THE AMERICAN COLONIES, 71 (1943).

independence.[10] "The provision in the United States Constitution was a reflection of political principles already firmly established in the States." Tenney v. Brandhove, 341 U.S. 367, 373, 71 S.Ct. 783, 786, 95 L.Ed. 1019 (1951).

In an 1808 Massachusetts decision by the highest court of that state,[11] subsequently characterized by the Supreme Court of the United States as an authoritative description of the constitutional provision, Chief Justice Parsons wrote:

"These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal. I, therefore, think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered. I will not confine it to delivering an opinion, uttering a speech, or haranguing in debate, but will extend it to the giving of a vote, to the making of a written report, and to every other act resulting from the nature and in the execution of the office. And I would define the article as securing to every member exemption from prosecution for everything said or done by him as a representative, in the exercise of the functions of that office, without inquiring whether the exercise was regular, according to the rules of the House, or irregular and against their rules. I do not con-

fine the member to his place in the House; and I am satisfied that there are cases in which he is entitled to this privilege when not within the walls of the representatives' chamber."

■■ What we derive from this historical review of the congressional privilege is a firm conviction that the constitutional provision is to be interpreted liberally and not narrowly. We also conclude that the general test to be applied where the privilege is asserted is that whenever the motivation for making a speech is called into question, the privilege applies. Two leading Supreme Court opinions confirm this view.

Kilbourn v. Thompson,[12] decided in 1880, held, among other things, that a congressman who initiates, supports and votes for a resolution calling for the arrest of another person cannot be questioned in court in a suit for malicious prosecution. In 1951, Tenney v. Brandhove[13] confirmed Kilbourn's holding that the courtroom is not the proper place to question the motives of legislators where they are acting within their traditional sphere. Justice Frankfurter, speaking for the Court, said:

"*The claim of an unworthy purpose does not destroy the privilege.* Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distrac-

10. See, e. g., Maryland Declaration of Rights, Nov. 3, 1776 ("That freedom of speech and debates, or proceedings in the Legislature, ought not to be impeached in any other court or judicature."); Massachusetts Constitution of 1780, Art. XXI ("The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action or complaint, in any other court or place whatsover."); New Hamp-

shire Constitution of 1784, Part 1, Art. XXX ("The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any action, complaint, or prosecution, in any other court or place whatsoever.").

11. Coffin v. Coffin, 4 Mass. 1 (1808).

12. 103 U.S. 168, 26 L.Ed. 377 (1880).

13. 341 U.S. 367, 71 S.Ct. 783, 95 L Ed. 1019 (1951).

tions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of this Court in Fletcher v. Peck, 6 Cranch 87, 130, 3 L.Ed. 162, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned." 341 U.S. at 377, 71 S.Ct. at 788 (Emphasis added.)

Equally broad is the textwriters' description of the privilege.[14] While none of them treats directly the question before us, the language of each is unequivocal in attributing to the constitutional provision wide and almost absolute scope.

What we have said thus far is, we think, generally accepted. The question with which we are faced is whether these general principles become inapplicable when bribery is a motivating factor for making a speech in a legislative chamber. The Australian courts have considered the effect of the privilege where criminal prosecutions were brought against legislators for taking bribes to cast their votes and held that the privilege did not protect accused legislators. Regina v. White, 13 S.C.R. (N.S.W.) 332 (1875); Rex v. Boston, 33 C.L.R. 386 (1923). See also the Canadian case of Regina v. Bunting, 7 O.R. 524 (1885). These cases are not binding on us but we consider them, especially as they bear on the historic concept of the privilege.

While it is true that count one of the indictment alleges a "conspiracy to de-

fraud the United States" and not bribery, the District Court, by citing federal and state statutes which make the acceptance of a bribe a criminal act, recognized the close relation between the two.[15] The District Judge also noted that in no instance has the constitutionality of either the federal or a state bribery statute ever been questioned. Reasoning by analogy from these statutes and the state cases decided under them—which do not, however, discuss the constitutional question—the Judge concluded that "the prosecution of a Member of Congress for receiving money from a private person for making a speech on the floor of the House would not be barred by Art. 1, sec. 6, cl. 1 of the Constitution." 215 F.Supp. 300, 307 (D.Md.1963).

■ Basic to the conclusion of both the District Judge and the Government is the reasoning that "[t]o hold Count One of the present indictment barred by the privilege would subvert rather than advance the purpose for which the privilege exists—*the independence of the legislator in the fulfillment of his public trust.*" 215 F.Supp. at 307. (Emphasis added). It would be less than candid to deny the appeal of this reasoning, for one readily perceives a difference between fearless speech and corrupt speech, but after deliberate consideration we must reject the District Court's conclusion.

Inevitably, the indictment required an inquiry into Johnson's reason for delivering the speech, the very inquiry which the Supreme Court has explicitly declared to be beyond a court's power. Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). The contents of

14. 1 BLACKSTONE, COMMENTARIES, 164 (Cooley 4th ed. 1899); 2 COOLEY, CONSTITUTIONAL LIMITATIONS, 929 (8th ed. 1927); CUSHING, LEGISLATIVE ASSEMBLIES, § 601 (2d ed. 1866) ("[I]n short, * * * the privilege in question secures the members of a legislative assembly against all prosecutions, whether civil or criminal, on account of any thing said or done by them, during the session, resulting from the nature and in the exercise of their office."); DELOME, THE CONSTITUTION OF ENGLAND, 66 (5th ed. 1885); 2 THE WORKS OF JAMES WILSON, 37–38

(1896); SCHWARTZ, A COMMENTARY ON THE CONSTITUTION OF THE UNITED STATES, 104 (1963); 1 STORY ON THE CONSTITUTION, § 866, p. 600 (3d ed. 1858) ("The next great and vital privilege is the freedom of speech and debate, without which all other privileges would be comparatively unimportant or ineffectual."); 1 WILLOUGHBY, THE CONSTITUTION OF THE UNITED STATES, § 233 (1910).

15. United States v. Johnson, 215 F.Supp. 300, 306 n. 6 (D.Md.1963).

the speech as such were not challenged. In fact the indictment attacked only the purpose for which the speech was made, i. e., "to defraud the United States." To prove this, however, the speech in its entirety was introduced into evidence and was commented upon extensively by the prosecution during the trial and in the closing arguments. Since Johnson could not deny making the speech it naturally became necessary for him to demonstrate that his purpose for delivering it was good. But the Supreme Court has declared in Tenney that "[t]he claim of an unworthy purpose does not destroy the privilege." 341 U.S. at 377, 71 S.Ct. at 788. The speech was more than an incidental feature of the conspiracy charged. Fully one-half of the testimony introduced at the trial related to the speech.

Federal cases discussing the privilege have repeatedly held that the good or bad faith of the member making the speech is immaterial. Indeed this is precisely the teaching of Tenney. In Cochran v. Couzens, 42 F.2d 783 (D.C. Cir.), cert. denied, 282 U.S. 874, 51 S.Ct. 79, 75 L.Ed. 772 (1930), for example, the complaint alleged that a Senator "'[m]aliciously, wilfully, falsely and wrongfully" delivered a "scandalous, malicious and defamatory slander" in a speech on the floor of the Senate. In affirming the District Court's dismissal of the complaint, the court held that "the words forming the basis of plaintiff's action were uttered in the course of a speech in the chamber of the Senate of the United States, and were *absolutely privileged* and not subject to 'be questioned in any other place.'" 42 F.2d at 784 (Emphasis added). The court added:

> "It is manifest that the framers of the Constitution were of the view that it would best serve the interests of all the people if members of the House and Senate were permitted unlimited freedom in speeches or debates. The provision to that end is, therefore, grounded on public policy, and should be liberally construed.

Presumably legislators will be restrained in the exercise of such a privilege by the responsibilities of their office. Moreover, in the event of their failure in that regard, they will be subject to discipline by their colleagues. Article 1, § 5." 42 F.2d at 784.

See also Barsky v. United States, 167 F.2d 241 (D.C.Cir.1948).

■ Couzens, we note, was a civil action, but it would be inconsistent to conclude that a corrupt speech is less within the congressional privilege when labeled a crime. It may be argued with some reason that it is not indispensable to the "independence of a legislator" to shield him from court action when he uses his office to willfully and intentionally slander another in a speech; yet, as we have seen, he cannot be called to account in a court of law for such a willful abuse. The constitutional protection against being called upon to answer in "any other place" for a speech delivered in the House is equally impaired whether the court proceedings are criminal or civil. Indeed, fear of criminal prosecution may be the graver inhibition.

Coffin v. Coffin, which was quoted at length by the Supreme Court in both Kilbourn and Tenney, emphasized that the privilege belongs to the Congress and was developed for the benefit of Congress as a whole. This does not mean that a member of Congress is immune from sanction or punishment. Nor does it mean that a member may with impunity violate the law; it means only that the Constitution has clothed the House of which he is a member with the sole authority to try him. In this respect the Constitution has made the Houses of Congress independent of other departments of the Government. These bodies, the Founders thought, could be trusted to deal fairly with an accused member and at the same time do so with proper regard for their own integrity and dignity.

The broad interpretation we give to the congressional privilege does not, we

believe, contravene a caveat the Supreme Court placed at the conclusion of both the Kilbourn and Tenney opinions. In its entirety, the caveat pronounced in Kilbourn reads:

"It is not necessary to decide here that there may not be things done, in the one House or the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible. If we could suppose the members of these bodies so far to forget their high functions and the noble instrument under which they act as to imitate the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow the example of the French Assembly in assuming the function of a court for capital punishment we are not prepared to say that such an utter perversion of their powers to a criminal purpose would be screened from punishment by the constitutional provision for freedom of debate." 103 U.S. at 204–205.

From the illustrations hypothesized in the caveat, it is plain that the Court envisioned a situation so extreme that the Congress as a whole, because of its total involvement in the corruption, was incapable of taking appropriate disciplinary action against individual members. No such situation is before us, nor does this case even remotely approximate one.

 All will agree that when a congressman accepts compensation for a speech, his act is reprehensible. However, the privilege being applicable, courts are barred from exercising jurisdiction, and the duty falls upon the House of Congress to punish its offending member. It is not an unfamiliar concept to bar a conviction, regardless of how contemptible the defendant's act may be, in order to protect and preserve an important constitutional principle. This is precisely the doctrine underlying the innumerable cases involving violations of the Bill of Rights and the Fourteenth Amendment. No better examples need be cited than the recent cases of Mapp v. Ohio [16] and Gideon v. Wainwright.[17]

Judicial enforcement of the constitutional rights asserted in these two, and in similar, cases goes even further, for it often removes all possibility of punishment, while here sanctions remain unimpaired which may be imposed by the House membership.[18] If these sanctions be deemed insufficient in particular cases, the limitation comes from the Constitution.

 A practical reason exists for invoking the congressional privilege, which meets the objective of the constitutional provision. The design is to promote the independence of all congressmen. To avoid restraint on free expression on the floor of either House, protection is given against the hazard and harassment of inquiry in any court. It is no answer, therefore, to say that if the accused member is innocent of accepting a bribe he has nothing to fear. A groundless charge may be sufficient to destroy him at the polls. Moreover, the process of indictment by a grand jury and inquiry in a court may itself be so devastating that an innocent congressman may well fear it.

It is interesting to note that the Supreme Court has recently used a similar approach in related areas involving potential impediments on constitutional rights. Discussing the oath condemned in Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), Mr. Justice White said:

"The uncertain meanings of the oaths require the oath-taker—teachers and public servants—to 'steer far wider of the unlawful zone', Spei-

16. 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

17. 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

18. Art. I, § 5, cl. 2 of the United States Constitution reads: "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member."

ser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460, than if the boundaries of the forbidden areas were clearly marked. Those with a conscientious regard for what they solemnly swear or affirm, sensitive to the perils posed by the oath's indefinite language, avoid the risk of loss of employment, and perhaps profession, only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited."

Similarly in New York Times Co. v. Sullivan, 376 U.S. 254, 278, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court said:

"Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive."

In that case, Mr. Justice Goldberg in a concurring opinion quoted Judge Learned Hand's summary of the policies underlying the grant of immunity against liability to legislators, judges and executive officers. The same policies apply here.

" 'It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to

the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.' * * * Gregoire v. Biddle, 2 Cir., 177 F.2d 579, 581." 376 U.S. at 302–303, 84 S.Ct. at 738.

In the case of a congressman, the possibility—even the likelihood—of ultimate vindication in a court proceeding is no substitute for the guarantee held out by the Constitution.

■■■ Count one of the indictment is unconstitutional as applied to defendant Johnson. But as none of the privileges of Article I, section 6 pertain to the defendants who are not members of Congress, their attack on the first count, unlike Johnson's, is not sustained.

B. COUNTS 2 TO 8

We turn now to the remaining counts of the indictment. Counts 2 to 8 allege substantive violations of 18 U.S.C.A. § 281.[19] Each count charges that Johnson

19. Section 281 provides, in part:
"Whoever, being a member of or Delegate to Congress, or a Resident Commissioner, either before or after he has qualified, or the head of a department, or other officer or employee of the United States or any department or agency

thereof, directly or indirectly receives or agrees to receive, any compensation for any services rendered or to be rendered, either by himself or another, in relation to any proceeding, contract, claim, controversy, charge, accusation, arrest, or other matter in which the

conferred with officials of the Justice Department in an attempt to secure the postponement and eventual dismissal of criminal charges pending against Edlin in Maryland, and that for these services he received compensation.

## I. *Venue*

It is conceded that none of the services recited in the indictment was rendered in Maryland. The charge is that Johnson received seven checks—one for each of counts 2 to 8—and that he deposited them all in a Maryland bank. Four of the checks (counts 3 to 6) were drawn on a Maryland bank and three (counts 2, 7 and 8) on a Florida bank. The appellants contend that Maryland was not the proper district in which to try these substantive counts because the checks were delivered to Johnson in Washington, D. C., and that was where "compensation" was received.

 Venue is more than a technical concept; it is a constitutional requirement. Article III, section 2, clause 3 commands that "[t]he Trial of all Crimes * * * shall be held in the State where the said Crimes shall have been committed * * *." As pointed out by Justice Frankfurter in United States v. Johnson, 323 U.S. 273, 275, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944), the Sixth Amendment "underscore[s] the importance of this safeguard" in requiring trial "by an impartial jury of the State and district wherein the crime shall have been committed." See also United States v. Cores, 356 U.S. 405, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958).

In the case of Burton v. United States, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 (1905), the Supreme Court had occasion to pass upon the nature of checks as compensation. The indictment in that case charged the defendant, a United States Senator, with the receipt of various checks at St. Louis, Missouri. The case was tried in the United States District Court of Missouri where the evidence showed that the checks, drawn on a St. Louis bank, were in fact delivered in Washington, D. C. The defendant contended, unsuccessfully in the District Court, that Washington, not Missouri, was the proper venue.

The Supreme Court noted that after the defendant received the checks in Washington he endorsed and deposited them in a Washington bank. After a detailed discussion of the relevant banking laws, the Court concluded that the Washington bank became the owner of the checks upon Burton's endorsement and was not his agent for collection from the St. Louis bank. The Court then held:

> "All this made a payment at Washington, and as a result there was a total lack of evidence to sustain the sixth, seventh, eighth, and ninth counts of the indictment. The court should have, therefore, directed a verdict of not guilty on those counts." 196 U.S. at 304, 25 S.Ct. at 248.

 The case makes it clear that the place of the delivery of a check is not the sole determinative of venue. If it were, the Court's wrestling with banking laws to determine where the payment of the check occurred would have been needless and irrelevant. United States v. Lotsch, 102 F.2d 35 (2d Cir. 1939).

 Burton does not supply the answer as to venue for all of the substantive counts, but it is conclusive as to counts 3 to 6. In these counts it was alleged that Johnson received checks drawn on one Maryland bank and deposited them in another Maryland bank. Maryland banking law, unlike that in force in Washington, D. C., at the time of the Burton case, designates a bank in which a check is deposited, as an agent for collection only. 1 Md.Code (1957), Art. 11 §§ 119, 121. This presents no problem as to counts 3 to 6, for the bank

United States is a party or directly or indirectly interested, before any department, agency, court martial, officer, or any civil, military, or naval commission, shall be fined not more than $10,000 or

imprisoned not more than two years, or both; and shall be incapable of holding any office of honor, trust, or profit under the United States."

making final payment, i. e., the drawee bank, and also the bank in which the checks were deposited were both located in the District of Maryland.

■ The venue for counts 2, 7 and 8 is not as clear, because in these counts the drawee bank was located in Florida, while the depositing bank was in Maryland. Burton did not consider the effect on venue where the depositing and paying banks are in different districts.[20]

The Government contends further that on these three counts venue in Maryland can be supported on the theory that when a check is involved, "compensation" constitutes a continuing offense within the meaning of 18 U.S.C.A. § 3237[21] and that a prosecution can be brought for a violation of section 281 either where the check was deposited or where it was paid. The proposition is well supported.

In Benson v. Henkel, 198 U.S. 1, 9, 25 S.Ct. 569, 570, 49 L.Ed. 919 (1905), a prosecution for bribery, the indictment charged that "the defendant unlawfully *gave* to such officer, in the District of Columbia, certain sums of money, with the intent to induce him to do an act in violation of his lawful duty * * *." (Emphasis added.) The evidence showed that the defendant had mailed cash from California to the District of Columbia. The contention was that venue lay in California, where the cash was mailed, and not in Washington, where the case was tried. The Court disagreed, noting

that "the case is treated as covered by § 731 [now 18 U.S.C.A. § 3237], providing that, when an offense is begun in one district and completed in another it shall be deemed to have been committed in either, and be tried in either, as though it had been wholly committed therein."

The Government's position is that if *giving* can be considered a continuous act so too can *receiving* which is the same act viewed from the other side. We consider the analogy sound and, like the District Court, adopt it. When Johnson deposited the Florida checks in his Maryland bank for collection he started a chain of events not unlike the mailing of cash in Benson.[22]

We are fully advertent to certain language in the Burton case which, standing alone, appears to cut the other way.

"This is not a case of the commencement of a crime in one district and its completion in another, so that, under the statute, the court in either district has jurisdiction. Rev.Stat. § 731, U.S.Comp.Stat. 1901, p. 585. There was no beginning of the offense in Missouri. The payment of the money was in Washington, and there was no commencement of that offense when the officer of the Rialto Company sent the checks from St. Louis to defendant. The latter did not thereby begin an offense in Missouri." 196 U.S. at 304, 25 S.Ct. at 248.

20. Justice Harlan dissented from the Court's opinion in Burton. He took the view that the Washington bank in which Burton deposited the check was only an agent for collection, and that the St. Louis bank, the drawee bank, was the bank making final payment. Because of this position he, unlike the other Justices, was required to consider the effect on venue where the depositing district and the payment district are different. His conclusion was that venue was properly laid in the District Court at St. Louis.

21. 18 U.S.C.A. § 3237 reads, in pertinent part, as follows:
"(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun

in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

22. This conclusion does not conflict with Justice Harlan's dissent in Burton, noted in n. 20. The original prosecution against Senator Burton was brought in the district where, as Justice Harlan concluded, final payment was made on the check, i.e., Missouri. Justice Harlan held this to be proper. In the instant case, had the original prosecution been brought in Florida, the situs of the drawee bank, the continuing offense statute would have supported venue there, as well as in Maryland.

We agree with the District Court that the above language does not negative the result we reach here. The Henkel and Burton cases were decided at the same term, and the Supreme Court in Burton was merely rejecting a government argument that one is guilty of receiving compensation at the moment a check is sent by the payer. In the instant case the indictment alleged, and the proof established, that Johnson both received and deposited the checks in Maryland.

We conclude, therefore, that the District of Maryland was a proper venue for the prosecution of the substantive counts, 2, 7 and 8, as well as 3 through 6.

2. *Application of Section 281 to Johnson*

 It is the appellants' position that counts 2 to 8 fail to state an offense against Johnson because his conversations with officials of the Justice Department were in his capacity as an attorney in connection with a case pending in court. Hence they contend that section 281 covers neither Johnson as principal nor the others as aiders and abettors. The argument is hollow. Steadfastly throughout the trial Johnson maintained that he was not acting as an attorney. But even if he had maintained the contrary, the mere fact that the conversations related to a pending court proceeding would not bar a prosecution under section 281.

The purpose of section 281 is stated in United States v. Adams, 115 F.Supp. 731, 734–735 (D.N.D.1953):

"It [section 281] was aimed at preventing Congressmen, officers and employees of the United States Government from using the weight of their positions or their influence in connection with matters which were to be determined before any department, agency, court martial, officer or commission and was to assist in insuring the integrity of such department determinations."

See also Burton v. United States, 202 U.S. 344, 368, 26 S.Ct. 688, 50 L.Ed. 1057 (1906).

The legislative history of the predecessor to section 281 makes it clear that Congress considered and rejected a proposal to prohibit lawyer-congressmen from appearing as counsel in courts. This policy decision continues to this day, and its rationale is obvious. Governmental departments, agencies, etc., are dependent upon Congress for support, and therefore these bodies are readily susceptible to pressures from individual Senators and Representatives. Courts, on the other hand, are surrounded by protections to assure their independence. A lawyer-congressman's status and influence when he appears in open court are entirely different when he intervenes in a departmental matter. This difference was given legislative recognition.

Senator Trumbull, Chairman of the Senate Judiciary Committee when the statute was originally considered, reported to the Senate that the Committee proposed "to restrain members of Congress * * * from receiving a compensation * * * for doing any business before any Department * * * or anywhere else *except in the judicial tribunals* of the country." Cong.Globe, 38th Cong., 1st Sess. (1864), p. 555 (Emphasis added.) He added:

"This is not a bill to prevent attorneys from practising in courts of law, but it is a bill to prevent Representatives and Senators in Congress * * * from receiving a compensation for advocating claims in the departments and before the bureaus of the government * * *." Cong. Globe, 38th Cong., 1st Sess. (1864), p. 561.

While Edlin in particular stresses this history, it does not support his contention. The evidence was undisputed that Johnson did not enter his appearance in the criminal case pending against Edlin. In fact, the attorney who did represent Edlin in the criminal trial was not even

aware of Johnson's efforts in behalf of Edlin.

Edlin also argues that the indictment is defective because, "[t]he plain words of § 281 confine its operation to services in proceedings *pending* before any department, agency or officer of the Government." (Emphasis added). As the District Court noted, section 281 does not use the word "pending." "The words 'before any department, agency', etc. refer to where the services have been rendered or are to be rendered, not where the proceeding or other matter is pending." 215 F.Supp. 300, 316. The services alleged in the indictment were in relation to a matter in which the United States was a party, namely the criminal charge pending against Edlin; and the services were performed before a department, namely the Department of Justice. As noted above, the Department did have a significant role, and it had the power to take affirmative action as a result of Johnson's visits. Counts 2 to 8 of the indictment as they pertain to Johnson are sufficient. See Burton v. United States, 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057 (1906); United States v. Quinn, 111 F.Supp. 870 (E.D.N.Y.1953). Cf. United States v. Waldin, 122 F.Supp. 903 (E.D.Pa.1954); United States v. Adams, 115 F.Supp. 731 (D.N.D.1953).

It is not necessary for us to decide whether it is permissible for a congressman who is a lawyer to represent a client, solely before a government department, in relation to his client's court case and yet not enter his appearance in court. The District Court ruled that such activity would be permissible, if the congressman-lawyer disclosed to the department that he is appearing as an attorney and not as a congressman. This conclusion is as favorable as Johnson was entitled to demand, for in the absence of such disclosure the congressman's appearance

would unquestionably violate the plain words of the statute.

### 3. *Edlin and Robinson as Aiders and Abettors*

▮ A further objection to the validity of the indictment is pressed by appellants Edlin and Robinson. They say that under the applicable decisions no prosecution can be sustained for aiding and abetting a violation of section 281. Decisions directly in point are in conflict. United States v. Bowles, 183 F.Supp. 237 (D.Me.1958), supports the appellants while May v. United States, 175 F.2d 994 (D.C.Cir.1949), is contra, as is United States v. Quinn, supra.

Relevant, but distinguishable, is Gebardi v. United States, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932), where the Supreme Court held that in a Mann Act prosecution, a woman whose participation is limited to willfully permitting another to transport her in interstate commerce for purpose of prostitution cannot be tried as a conspirator.[23] See also Nigro v. United States, 117 F.2d 624 (8th Cir. 1941), and Lott v. United States, 205 F. 28 (9th Cir. 1913).

But the indictment before us is different from those in the above cited cases, and the difference is decisive. This indictment does not charge that Robinson and Edlin aided and abetted in the completion of the offense merely as payers. It goes further. It charges them with a far more active role—"aiding, abetting, counselling, commanding, inducing and procuring." This charges conduct in *addition* to the mere payment of money necessary to complete a violation of section 281.[24]

## II. DISCLOSURE OF THE GRAND JURY TRANSCRIPT

Prior to trial, Johnson moved for the production of his grand jury testi-

---

23. Cf. United States v. Holte, 236 U.S. 140, 35 S.Ct. 271, 59 L.Ed. 504 (1915).

24. In Bowles the indictment apparently averred only that the alleged aiders and abettors had paid money. The court's opinion indicated no other acts of as-

sistance. The same is true of Nigro and Lott. Because of the difference between these cases and ours, we are not required to rule on whether mere payment would be sufficient to sustain a charge of aiding and abetting.

mony. He supported his motion with an affidavit setting forth his reasons. In part, the affidavit reads:

"By reason of the length of the interrogation, the intensity at times with which it was conducted and the fact that I was tired physically and mentally from my work in the House of Representatives and my vigorous campaign for reelection on the Eastern Shore, I do not recollect a considerable part of my testimony."

The District Court denied the motion.

Later, it was disclosed that the Government, before the trial, had permitted a government witness to examine the witness' grand jury testimony. The witness' attorney was accorded the same opportunity, and together they read a volume of the transcript containing the witness' testimony and the testimony of others. The appellants moved the court for the production of all the grand jury testimony on the ground that the Government had breached "the veil of secrecy" usually surrounding grand jury records. This motion also, the court denied. But the court made available to the appellants the volume of testimony revealed by the Government. We find no error in either of these rulings.

The practice of shielding grand jury proceedings from discovery is longestablished and rests on sound policy.[25] Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1957); United States v. Johnson, 319 U.S. 503, 513, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943). In recent years the Supreme Court has reaffirmed its commitment to this practice. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959), affirming 260 F.2d 397 (4th Cir. 1958); United States v. Proctor & Gamble, 356 U.S. 677, 7 S.Ct. 983, 2 L.Ed.2d 1077 (1958).

■■ Of course, where there is a particularized need for grand jury minutes, it is within the sound discretion of the district court to require their production. Pittsburgh Plate Glass Co. v. United States, supra; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 231 (1940). But it is manifest from a reading of Johnson's affidavit that he showed no particularized need. His justification for requesting his testimony is not different from that of any other defendant. If his motion were to be granted then all similar motions would have to be granted automatically regardless of any showing of particularized need. It is difficult to imagine a defendant who could remember all of his grand jury testimony, or who was not emotionally strained when giving it. No special impact on Johnson is made to appear and there is no showing of a threatened injustice from the denial.

■■ Likewise, the fact that the Government, in preparation for the trial, disclosed a volume of the transcript to one of its witnesses does not require the complete abandonment of secrecy. Secrecy is maintained for the benefit of the grand jury and for the betterment of grand jury proceedings. United States v. Smyth, 104 F.Supp. 283, 304 (N.D.Cal.1952). Where it becomes necessary to breach the secrecy of the proceedings, it should be done "discreetly and limitedly." United States v. Proctor & Gamble, 356 U.S. 677, 683, 7 S.Ct. 983,

25. Perhaps the most frequently cited justification for the practice is found in United States v. Rose, 215 F.2d 617, 628–629 (3rd Cir. 1954). There the court summarized the reasons for the rule as follows:

"(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."

(1958). This is what the Judge did. He repaired any possible damage to the defendants and equalized the situation by permitting them to examine the same testimony which was shown to the government witness.

### III. SUFFICIENCY OF THE EVIDENCE

The appellants complain that the evidence is insufficient to support the verdict. To a large extent their contentions merely repeat the arguments made in their attack on the indictment. For example, arguing the insufficiency to support a finding of a section 281 violation, Edlin reintroduces his concept of the statutes,[26] and follows through with the assertion that there was no evidence showing a violation of section 281 as he defines it.

 The trial was long, extending over eleven weeks, and the record is mammoth, consisting of 41 volumes of 5600 pages of testimony and many exhibits. We have closely examined this mass of material and have carefully considered the arguments. To restate all of the evidence here would be a useless exercise. The posture of the case, on appeal from a judgment of conviction, requires us to view the evidence in the light most favorable to the Government. For the present purpose, a condensed statement will suffice.

Appellant J. Kenneth Edlin was the dominating force in two Maryland savings and loan associations, First Colony Savings and Loan Association and First Continental Savings and Loan Association. Robinson was Edlin's associate and an officer in each of these associations. According to Martin Heflin, a public relations man, Edlin and Robinson consulted him in April, 1960, about the possibility of having a speech delivered in Congress in behalf of savings and loan institutions. Robinson made an initial draft of such a speech and sent it to Heflin who edited it and inserted the words "Mr. Speaker" at appropriate places. Heflin, however, pointed out to Robinson and Edlin that there was no reason to make the speech at that time, and that no one "could be justified in making a speech."

The next month, May, 1960, Heflin, Edlin and Jackson Rains, an accountant for First Colony, met with Congressman Johnson in a Washington restaurant where they discussed the situation of Maryland savings and loan associations. Johnson asked Heflin to send him a résumé of the meeting.

On June 30, 1960, Johnson delivered the speech on the floor of the House of Representatives. Johnson testified that the speech was prompted by an unfavorable newspaper article in the May 27, 1960, edition of the Washington Star, and by his own desire to create a political issue for the upcoming congressional election. The newspaper article, however, was a relatively minor one and appeared on an inside page. On cross-examination Johnson admitted that he never had any complaints from his constituents concerning the article or even about savings and loan associations in general, and that no constituent had requested him to make a speech. He also admitted that he made no mention of the speech either in his customary weekly newsletter to constituents or during his campaign.

Johnson also testified that his administrative assistant, Manual Buarque, wrote the speech with the aid of information supplied by Heflin. Buarque testified to the same effect. But other evidence cast grave doubt on the truthfulness of this testimony. Another version of the authorship of the speech came from Accountant Rains, who testified that immediately before or after the speech was delivered Edlin showed him a copy. Rains also testified that on July 4, 1960, on a plane trip from Maryland to Florida, Robinson and Edlin joked about the authorship of the speech. His testimony was:

"Everyone was in good spirits. Mr. Edlin and Mr. Robinson were sitting together and they were showing the

26. See section IA1, supra.

speech back and forth and saying, jokingly, or facetiously, 'How do you like the speech I wrote,' and the other one would say, 'What do you mean, you wrote it? I wrote it,' and that sort of thing."

Ten days before the speech, Robinson sent Johnson a check for $500. Both men claimed at the trial that it was a campaign contribution, but the evidence showed that when the check was drawn Robinson's bank account was insufficient to cover the sum, and that immediately thereafter he deposited a $300 check from First Colony. First Colony recorded the check as a legal expense.

First Continental Savings and Loan thereafter ordered 50,000 reprints of the speech, underlined in red at significant portions and used to attract depositers.

It is important to note here that as of 1959, Edlin, together with Rains and First Colony, were under indictment in the District Court of Maryland for mail fraud. Rains testified that when Edlin showed him the speech, he reassured him about the pending indictment. According to Rains, Edlin said "[Y]ou see, we have friends on the Hill—we have nothing to fear on our indictment. These people are interested in us and the injustice we have been done."

The testimony of Edlin's secretary, Mrs. Sadie Goldman, was significant. She testified that in the first week of June, 1960, (before the speech) Edlin came into the office in an unusually good mood and told her: "Well, I have made a new contact. There is no stopping us now. The sky's the limit. We'll have a chain of banks, Sadie, we are going to be rich. Seriously, Sadie, it is a Congressman." She also testified that she later asked Robinson why Edlin was so excited. Robinson asked her if she had ever heard of Congressman Johnson, and when she said she had not, Robinson told her, "You will hear plenty about him now. He is on our payroll. It is costing Ken [Edlin] plenty."

Johnson claimed at the trial that when he made the speech he did not know that an indictment was pending against Edlin. Buarque, the Congressman's administrative assistant, testified that he was aware of the indictment but did not inform Johnson. In closing arguments, the Government maintained that in the context of the events both Johnson's and Buarque's testimony was "incredible."

In addition, Mrs. Goldman said that in July, 1960, she asked Robinson what would happen to her job if Edlin were convicted. Robinson replied, "You have nothing to worry about. The Congressmen are being paid well and Ken [Edlin] will never go to jail. Don't worry."

The evidence is uncontradicted that Congressman Johnson did receive the checks mentioned in the indictment and that when he, together with Congressman Boykin, spoke to the Attorney General and other members of the Justice Department in behalf of Edlin, he did not tell them that he was appearing as an attorney.

Both Robinson and Edlin conferred with Johnson a number of times as to the best approach to the Department. Robinson also prepared an analysis of the indictment for presentation to the Justice Department.

Louis Goldman, an attorney, testified that "Mr. Edlin from time to time would say that he had nothing to worry about the indictment. That his friends on the Hill would take care of it for him and that everything would turn out all right." In response to the question whether Edlin ever referred to costs, Goldman answered: "From time to time Mr. Edlin would say that it is costing him a lot of money and that the cost is eating him up." He also testified that on one occasion, noticing that Edlin looked worried—

"I asked him what was wrong, and at that time he told me that he was concerned with the fact that Congressman Boykin and Congressman Johnson were not getting anywheres with his indictment; that it was costing him a lot of money. When

I asked him what he meant by that, he stopped for a minute, looked at me, and said, 'Forget it.' That was the end of that."

At the trial the appellants claimed that the checks listed in the indictment represented payments to Johnson for valid legal services. It was the Government's contention that to a large extent the alleged legal services were either performed by other attorneys or not performed at all. Our examination of the record leads to the conclusion that there was ample basis, both in the testimony in chief and in cross-examination of Johnson and Robinson, for the jury to believe that the appellants' explanation for the checks was false and that the money was paid to Johnson for making the speech and for using his influence in the Department of Justice.

For example, in his direct testimony Johnson related that he had performed legal services on 305 mortgages to the Cassell Land Company. His testimony was that over $1,600,000 was involved and that his job was to review the mortgages, half of which he found to be defective. To correct the defects, he testified, he and another lawyer drew up one confirmatory mortgage. On cross-examination, he said he could not remember giving this testimony on direct, but repeated that there was a confirmatory mortgage. However, it was shown that before the Montgomery County Grand Jury he swore that he redrafted each of the defective mortgages. Faced with the conflict, he admitted that the grand jury testimony was incorrect. The prosecution then confronted him with a prepared statement he had issued, to the effect that "new *indentures* had to be made to correct the mistakes [in the mortgages]". (Emphasis added). In addition to this obvious conflict, he then acknowledged on cross-examination that he did not prepare the confirmatory mortgage, but that another lawyer did.

Again, in direct testimony Johnson had said in reference to a proposed loan to the Savarin Development Corporation: "I did participate in the preparation of the entire loan agreement, the mortgages." Yet he later conceded that he did not mention the loan to the grand jury and, on cross-examination, stated that Robinson actually prepared the loan papers.

Two attorneys who assertedly worked with Johnson testified that they and not Johnson performed the legal work. One, Carrico, testified that shortly before the trial Johnson visited him and asked him to sign a prepared statement concerning Johnson's legal services. Carrico refused because the proffered statement recited that Johnson had visited him to discuss a foreclosure—a statement Carrico would not confirm and his records did not reflect.

Moreover, Johnson introduced into evidence many legal documents on which he had placed penciled notations. On cross-examination, however, a revealing light was shed when it was shown that Johnson had earlier given photostats of these same documents to the FBI and that the photostats were without the penciled marginal notes. Johnson had also furnished the FBI a photostat of a letter he had allegedly written to Robinson discussing the validity of a long agreement. The letter bore a Berlin, Maryland, return address, but its authenticity was impeached by the telephone company's records showing that throughout the day the letter was supposed to have been written in the town of Berlin, on the Eastern Shore of Maryland, Johnson placed long distance phone calls from his Washington office.

Robinson testified that Johnson was on a retainer, yet a statement he made to the FBI did not reflect this. On the contrary, in the FBI report, which he signed, he declared that particular checks were paid to Johnson for specific legal services. The checks, specified in the indictment, aggregating $17,550, which the appellants now claim were for legal services, are far in excess of the $6000 to $7500 claimed by Robinson in his interview with the FBI agent.

██ This testimony is representative of much more to the same effect.

If believed by the jury, as it obviously was, it is more than sufficient to support the jury's verdict.

## IV. ALLEGED PREJUDICIAL TRIAL ERRORS

### A. FBI AGENTS' TESTIMONY

At trial, the defense insisted that the checks specified in the indictment were payments to Johnson for legitimate legal services. Robinson and Johnson so testified. They both also testified that Johnson was on a retainer from the savings and loan associations controlled by Edlin.

To rebut this testimony, the Government called as a witness the FBI agent who had interviewed Robinson on January 11, 1962. In the course of the interview the agent made notes, then returned to his office, and, from these notes, dictated a narrative statement which was subsequently typed and presented to Robinson. Robinson read, corrected and signed the statement. A copy was given to him.

The agent testified that in the interview Robinson made no mention of any retainer fee having been paid to Johnson. He also testified that after the statement was signed Robinson added that the total fees paid to Johnson were between $6000 and $7500. If believed by the jury it meant that the appellants' evidence that Johnson was on a retainer was probably false. The suggested inference is that if he were on a retainer, as now claimed, Robinson would have mentioned this fact to the agent. Moreover, the $6000 to $7500 testified to by the agent as the sum Robinson claimed to be the total legal fees, was far below that claimed by the appellants at the trial.

On cross-examination, the agent stated that after he dictated Robinson's statement he destroyed the interview notes in accordance with the then customary FBI procedure. The completed and signed

statement of Robinson, which was made part of the agent's report, was retained in the FBI files. The agent further testified that while he was not aware at the time of the interview that Robinson was being investigated, he did recognize the possibility that Robinson might be called as a witness in a prosecution against Johnson. Robinson moved to strike the agent's entire testimony for the reason that the original notes of the interview had been destroyed. The court denied the motion and ruled the evidence admissible against Robinson, though not against Edlin.

Another FBI agent testified to an interview he had with Johnson's administrative assistant, Manuel Buarque. This agent's testimony was offered in rebuttal of certain testimony given by Buarque as a defense witness. At the interview, the agent made notes from which he later prepared his report. Buarque did not sign the report. Johnson's counsel moved that the agent's testimony be stricken because of the destruction of the notes. Again the trial court denied exclusion. Buarque, like Robinson, was furnished a copy of the report.

Appellant Robinson argues that the destroyed notes were a produceable "statement" under the Jencks Act, 18 U.S.C.A. § 3500, and that their willful destruction by the FBI required the agents' testimony to be stricken.[27] If the notes can qualify as a "statement," a serious question arises.

 This is not the first time that a court has been called upon to consider the effect of the destruction of FBI interview notes. Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); Killian v. United States, 368 U.S. 231 (1961); Ogden v. United States, 323 F.2d 818, 820–821 (9th Cir. 1963); United States v. Greco, 298 F.2d 247 (2d Cir. 1961). Each time the prob-

---

27. 18 U.S.C.A. § 3500(d) reads as follows:
"(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may di-

rect, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

lem has arisen the FBI has claimed that the notes were destroyed as part of FBI routine. This is really not a satisfactory answer. Where the agent testifies to matter he claims not to be in the notes and the defendant insists on a different version, an issue arises which may not be satisfactorily resolved in the absence of the original notes. If the notes were available, they might confirm or refute one version or the other. One of the purposes of both the Jencks decision and the Jencks Act is to afford the defense an opportunity to impeach witnesses. Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); United States v. Wenzel, 311 F.2d 164, 171 (4th Cir. 1962). The destruction of interview notes does not advance this purpose. Of course, a district court may find as a fact that the notes were not a substantially verbatim record, or that they were accurately copied into a report and then destroyed in good faith, but the necessity for inquiries along this line can be avoided by the preservation of notes until after the trial. Eliminating uncertainty may serve the interest of the Government no less than the defendant.

However this may be, as we view the Jencks Act, the notes in question do not qualify either as a "statement" or as a "report" as these terms are defined in the Act. Subsections (a), (b) and (e) are pertinent.

"(a) In any criminal prosecution brought by the United States, *no statement* or report in the possession of the United States which was *made by a Government witness* or prospective Government witness (other than the defendant) *to an agent of the Government* shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) *After a witness called by the United States has testified* on direct examination, the court shall, on motion of the defendant, order the United States to produce *any state-ment (as hereinafter defined) of the witness* in the possession of the United States which relates to the subject matter as to which the witness has testified. * * *

* * * * * *

"(e) The term 'statement', * * in relation to any *witness called by the United States,* means—

"(1) a written *statement made by said witness* and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement *made by said witness to an agent of the Government* and recorded contemporaneously with the making of such oral statement." (Emphasis added.)

The italicized portions require that the obtainable "statement or report in the possession of the United States" must be made *by the witness,* and the witness must be a *government witness.* By its terms, the Act does not cover statements made either by a defendant or by a defense witness.

The FBI agents' reports were within the Jencks Act because in each instance the "report * * * was made by a Government witness * * * to an agent of the Government." Holmes v. United States, 271 F.2d 635 (4th Cir. 1959) Copies of these verified statements were, as heretofore shown, in the defendants' possession. Assuming that the notes the agents made when interviewing Robinson and Buarque were "substantially verbatim recital[s] of oral statement[s]," they were at most statements of Robinson and Buarque, not statements "made by a Government witness."

Both FBI agents testified to their present recollection of the interviews. It was for the jury to consider the reliability and weight of their testimony, as compared to the testimony given by Robinson and Buarque.

### B. Alleged Comment on Edlin's Failure to Testify.

Edlin claims that the prosecutor improperly commented on his failure to take the stand. The incident referred to occurred at the end of the Government's closing summary to the jury. After pointing out asserted inconsistencies in the appellant's positions, the prosecutor spoke these words:

> "Members of the Jury, the defendant Edlin has presented no defense in this case. He has presented no evidence to contradict the charges against him. He has produced no evidence to deny numerous statements made by many, many government witnesses. He has produced no evidence to deny the testimony of numerous witnesses of his various activities which clearly indicate beyond any doubt, Members of the Jury, his guilt of the charges in this indictment."

In Davis v. United States, 279 F.2d 127 (4th Cir. 1960), a similar argument was presented. The answer we gave applies with equal force here:

> "The United States Attorney's argument cannot be said to have constituted a forbidden comment on the failure of the defendants to testify. He merely reviewed certain testimony and added, truthfully, that there was no evidence in contradiction."

The prosecutor did not draw improper attention to Edlin's refusal to testify. He merely pointed out that the defense did not introduce evidence to contradict certain of the prosecution's witnesses. Edlin was not the only person who could have refuted the Government's witnesses. Leathers v. United States, 250 F.2d 159, 165 (9th Cir. 1957). The prosecutor addressed himself to the absence of anything in the record to contradict the Government's version of the case. Under these circumstances his comment was not improper. Davis v. United States, supra; Garcia v. United States, 315 F.2d 133, 137 (5th Cir. 1963).

### C. Alleged "Totality of Prejudice"

Edlin launches a more general attack on the trial, claiming that evidence admitted against one or more of his co-defendants constituted "in its totality" prejudice as to him. This amounts to no more than a continuation of his argument, dealt with earlier, that conspiracy cases in general often produce evidence against one defendant which may prove prejudicial to his co-defendant.

We have closely examined the numerous references to the record and find that they do not show the claimed "totality of prejudice." The record attests the close and careful attention the trial judge gave to questions of the admissibility of evidence. Wherever necessary he instructed the jury that evidence admissible only against certain appellants should not be considered against the others. We have earlier in this opinion pointed out the dangers inherent in conspiracy trials, but as long as Congress authorizes prosecutions for conspiracy and the Supreme Court adheres to its holdings that the Constitution does not proscribe them, we must rely in large measure on the alertness of district judges to protect the interests of the individual defendants by properly cautioning the jury as to the purpose and effect of particular items of testimony. Indeed, the problem is potentially present whenever two or more defendants are jointly tried on any charge. The District Judge showed himself sensitive to the delicacy of his function as governor of the trial, and whenever the situation called for a specific instruction to the jury, appropriate instruction was given.

Where the trial judge finds that a defendant has been unduly harmed or his trial made unfair, he should in the interest of justice grant a new trial. United States v. Decker, 51 F.Supp. 20, 25–26 (D.Md.1943). Upon full consideration, we cannot say that Edlin had an unfair trial. In the particular rulings, and in the totality of the trial we perceive no unfairness.

**204**

#### D. INSTRUCTIONS TO THE JURY

█ Each of the appellants presses the contention that certain portions of the court's charge to the jury were erroneous. First, it is said that the court committed reversible error in refusing to instruct the jury to acquit unless they found that the alleged legal services performed by Johnson were a "sham and pretense." The court refused the tendered instruction "because there is no requirement on the Government to prove sham and pretense."

The Government did not claim, nor was it necessary for it to show, that Johnson performed absolutely no legal services. The appellants' requested instruction, if granted, was susceptible of being understood by the jury as requiring it to find a set of facts beyond that charged by the Government. The court dealt with the subject adequately and avoided the possibility of misunderstanding when it told the jury that receipt of the compensation was illegal if it was, "in whole or in substantial part" for services rendered before the Department of Justice. This was unquestionably appropriate to direct the jury to the issue impartially. Burton v. United States, 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057 (1906).

█ The appellants also contend that the District Court erred in refusing their requested instruction on circumstantial evidence. This would have required the jury to disregard all circumstantial evidence unless it excluded every reasonable hypothesis except guilt. In Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), the Supreme Court explicitly rejected this formulation. Justice Clark, who wrote for a unanimous Court, emphasized that "where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect [citations omitted]." Here the court did instruct on reasonable doubt, using the formulation approved by the Supreme Court in Holland. Refusal of the tendered instruction was not error. United States v. Lawrenson, 298 F.2d 880, 884 (4th Cir. 1960); Milanovich v. United States, 275 F.2d 716, 721 (4th Cir. 1960), rev'd on other grounds, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961).

█ Edlin requested an instruction to the effect that the jury could consider whether his actions were based upon the advice of counsel in determining his intent and good faith. United States v. Painter, 314 F.2d 939, 943 (4th Cir. 1963). The Judge's charge incorporated the substance of the requested instruction, and refusal to adopt Edlin's very words was not error. Other requested instructions were rejected, but we find no error, because insofar as they asserted valid propositions of law they were in essence embodied in the charge.

#### V. CONCLUSION

█ Though we find the evidence sufficient to support a guilty verdict on all counts, the invalidity of count one as applied to Johnson was obviously prejudicial to his right to the unbiased consideration of the jury on the remaining counts. Many of the events testified to at the trial related only to the speech. It was introduced into evidence and its authorship, contents, motivations and accuracy made the subject of extensive inquiry. The conclusion is unavoidable that this mass of evidence and comment, all inadmissible against Johnson, infected the jury's consideration of his innocence or guilt under the conflicts of interest counts. The judgment against Johnson is therefore vacated and the case remanded for a new trial on the counts charging violations of 18 U.S.C.A. § 281. As to Edlin and Robinson, the convictions are affirmed.

Judgment as to Johnson vacated and a new trial ordered with instructions; judgment as to Edlin and Robinson affirmed.