**UNITED STATES of America,
Appellee,**

v.

**John DOWDY, Appellant.**

**No. 72–1614.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 31, 1972.

Decided March 12, 1973.

As Modified on Denial of Rehearing
April 27, 1973.

Thornton H. Brooks and C. Allen Foster, Greensboro, N. C. (McLendon, Brim, Brooks, Pierce & Daniels, Greensboro, N. C., on brief), for appellant.

Barnet D. Skolnik, Attorney, Department of Justice (George Beall, U. S. Atty., Stephen H. Sachs, Sp. Asst. U. S. Atty., John G. Sakellaris, Asst. U. S. Atty., on brief), for appellee.

Before WINTER, RUSSELL, and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

Former Congressman John Dowdy, of Texas, was found guilty by a jury of each of the charges contained in an eight-count indictment.* In counts one and two, defendant was charged, together with Myrvin C. Clark who pleaded guilty, with conspiracy (18 U.S.C.A. § 371 (1969)) to violate the conflict of interest statute (18 U.S.C.A. § 203),[1] and conspiracy to violate the obstruction of justice statute (18 U.S.C.A. § 1505),[2] re-

---

* A summary of the indictment is attached as an appendix to this opinion.

1. In pertinent part, 18 U.S.C.A. § 203(a) (1969) subjects to criminal sanctions:
   Whoever . . . directly or indirectly receives or agrees to receive . . . any compensation for any services rendered or to be rendered . . . at a time when he is a Member of Congress . . . in relation to any proceeding . . . controversy, charge, [or] accusation . . . in which the United States is a party or has a direct and substantial interest, before any department . . . .

2. 18 U.S.C.A. § 1505 (1969) makes criminally liable:
   Whoever corruptly . . . endeavors to influence, obstruct, or impede . . . the due and proper administration of the law . . . before such department or agency of the United States, or the due and proper exercise of the power of inquiry under which such inquiry or investigation is being had by either House, or any committee of either House . . . .

spectively. In the third count, defendant was accused of interstate travel (18 U.S.C.A. § 1952) to facilitate federal bribery (18 U.S.C.A. § 201).[3] In counts four through eight, defendant was charged with five acts of perjury (18 U.S.C.A. § 1621 (1969)) before a federal grand jury in the District of Maryland. Defendant was sentenced to imprisonment and to pay a fine on each count. The sentences were consecutive in part and concurrent in part, so that the aggregate sentence was imprisonment for eighteen months and a fine of $25,000. Defendant appeals.

Defendant attacks his convictions on two principal grounds: first, that the indictment and the government's proof thereunder impugned his legislative acts as a member of the House of Representatives; and second, that certain tapes resulting from electronic surveillance and transcriptions of conversations should not have been admitted into evidence, principally with respect to the perjury counts. Specifically, with regard to the first ground of attack, defendant contends that substantial portions of the allegations of the indictment [4] and of the proof at trial revolved around his actions as Chairman of the Subcommittee on Investigations of the House of Representatives Committee on the District of Columbia in investigating whether a complaint, made to all of the members of the committee, warranted subcommittee hearings; and that his actions and motivations in this regard were immune from judicial scrutiny under the "speech or debate" clause of the constitution.[5] In regard to the admission into evidence of the tapes and transcriptions, defendant makes numerous objections. He claims violation of his fourth amendment rights, entrapment of him by the United States Attorney, duress upon the party to the taped conversations who purportedly consented to the taping, and violation of the constitutional concept of separation of powers.

We agree that defendant's convictions on the two conspiracy counts (counts one and two), the interstate travel count (count three), and the first two of the five perjury counts (counts four and five) were obtained by the use of evidence which infringed the speech or debate clause, but we conclude that the trial of the remaining perjury counts (counts six–eight) was not tainted by the evidence improperly admitted to prove the other counts. Moreover, we see no valid objection to the admission of the tapes and transcriptions with respect to the remaining perjury counts (counts six–eight) of the indictment. We also conclude that violations of counts one–five might have been proved without improper inquiry into legislative acts. We therefore reverse as to counts one, two, three, four and five, affording the government the right to try them anew if it be so advised, and affirm as to counts six through eight.

## I.

To establish the context in which defendant's various contentions arise, we state first what the government's proof, if believed, and certain uncontroverted proof, offered by the defendant, showed. Other facts will be stated elsewhere in the opinion.

---

3.  18 U.S.C.A. § 1952(a) (1969) renders criminal travel in interstate commerce or the use of the facilities of interstate commerce, *inter alia*, to promote any unlawful activity. "Unlawful activity" is defined in § 1952(b)(2) to include bribery in violation of the laws of the United States. 18 U.S.C.A. § 201 (1969) creates the crime of bribery of a "public official" which is defined in § 201(a) to include a Member of Congress.

4.  See Appendix, and particularly Overt Acts, numbers 19 through 23 of Counts One and Two.

5.  U.S.Const. Art. I, § 6, cl. 1:
    The Senators and Representatives . . . shall . . . be privileged from Arrest during their Attendance at the Session of their respective Houses . . . ; *and for any Speech or Debate in either House, they shall not be questioned in any other Place.* (Emphasis added.)

Congressman Dowdy, at the time of trial, was a member of the House of Representatives, representing the Second Congressional District of Texas. He had been a member of Congress since 1952. At all times pertinent to the trial of the case, he was a member of (1) the House Judiciary Committee, and (2) the Committee on the District of Columbia, and Chairman of that committee's Subcommittee on Investigations. By House Resolution 44, adopted February 16, 1965, the Committee on the District of Columbia, acting as a whole or by subcommittee, was authorized to conduct a full and complete investigation and study of the operation and administration of any department of the Government of the District of Columbia, and the operation and administration of any independent agency or instrumentality operating solely in the District. In 1963–1964, defendant's subcommittee had held extensive hearings and investigations of urban renewal within the District of Columbia. Defendant wrote an article on the subject, published in a magazine of national circulation, and made a number of speeches throughout the United States in opposition to governmental urban renewal.

A certain Nathan H. Cohen was an owner and President of Monarch Construction Corporation (Monarch). Monarch employed Myrvin C. Clark as its Sales Manager and Cohen's "right-hand man." Monarch was engaged in the home improvement business in Maryland and in the District of Columbia. In the early part of 1965, it was under investigation by various agencies of the federal and District of Columbia governments for its sales and financing practices. Apparently there was little question that Monarch and some of its principals had engaged in wholesale violations of the law.

Defendant made a speech to Monarch employees about urban renewal on June 1, 1965. Cohen first met the defendant at this time. Several months later, Cohen approached Clark with the idea that defendant could arrange immunity for Cohen from possible criminal proceedings by allowing Cohen to testify before the subcommittee about Monarch's operations. Clark communicated with defendant and mentioned that Cohen had information of national importance, wanted to testify before the committee, but wanted immunity because he feared self-incrimination. Clark told defendant that the Cohen family was wealthy and that Clark would "hit" the Cohens for a "political contribution" for defendant. Defendant agreed to talk with Cohen.

On or about September 16, 1965, Cohen met with defendant at defendant's office. Hayden Garber, Esquire, counsel to the committee, was present during part of the meeting. While Cohen and defendant were alone, Cohen informed defendant that his purpose in wishing to testify was to gain immunity and thereby avoid criminal prosecution. Defendant assured Cohen that he could handle the matter and a "fee" of $25,000 was agreed upon.

Earlier that same month, Clark counseled Cohen to use what Cohen termed "the front door-back door approach," that is, "of using a legitimate reason and legitimate excuse proffered at the same time that you tried to pay somebody or bribe somebody or get them on your side behind the scenes." To that end, Clark and Cohen prepared a series of documents asking for an investigation and hearing by the District of Columbia Committee and sent them to every member of the committee, along with a covering letter from Cohen's private attorney. Clark knew and informed Cohen that defendant would be in charge of any "investigation" which might result from this submission. Clark also informed Cohen that Clark had sought and obtained defendant's prior approval of the submission to all members of the committee. Shortly after this submission, the Cohen complaint was assigned to defendant's subcommittee for investigation by the Chairman of the House Committee on the District of Columbia, Hon. John L. McMillan of South Carolina.

On September 22, 1965, Cohen and his associates packed $25,000 in cash in an attache case, which Clark handed to defendant later that day at the Atlanta Airport, Atlanta, Georgia.

Shortly after September 22, 1965, defendant advised Clark that Cohen could not receive immunity by appearing as a witness before the committee, but that there was more than one way to handle the situation. On September 30, 1965, Cohen and defendant met in a Washington hotel and discussed the fact that the immunity plan would not work. The defendant advised Cohen that there was "more than one way to skin a cat" and if Cohen was not satisfied with results, defendant would return Cohen's money to him.

Meanwhile, Garber studied the material which Cohen and Clark had submitted to the committee and arranged a meeting with Cohen, which was held prior to October 5, to discuss the details of his complaints. Garber decided that he should find out what the License and Inspection Division of the District of Columbia had in its files. He prepared a subpoena, took it to defendant on October 13, and defendant signed it upon Garber's advice. Garber obtained the documents and took them back to his office for study.[6]

Next, Garber communicated with the Department of Justice, seeking information concerning Monarch's affairs. He was directed to the attorney who was familiar with them, and Garber arranged for that attorney to meet with defendant and Garber at defendant's office. The meeting was held in October, 1965. They discussed the Justice Department's case against Monarch and apparently the production of certain of the government's written reports of investigations of Monarch's affairs.[7] The jury was told fully of the matters which were discussed.

During October, 1965, defendant made certain documents available to Clark. Clark had them copied, giving the copies to Cohen and returning the originals to defendant. These documents were internal investigative files of the Housing and Home Finance Agency (HHFA) and records of the District of Columbia Department of Licenses and Inspections. The custodian of these records testified that they had been turned over to Garber on October 13, 1965, presumably in response to the subpoena.

Garber also arranged a meeting between defendant, Garber, and two officials of the Federal Housing Administration, parent agency to HHFA, in defendant's office on October 22, 1965. The findings and status of the Monarch investigation were discussed and certain internal investigative reports were left with defendant.[8]

Following these meetings, defendant told Clark that he had "explained [his] personal interest in the situation, a private interest" to the Department of Justice, i. e., the first Assistant United States Attorney for the District of Columbia who was in charge of the Monarch investigation in that office, and that defendant did not think that the assistant would "push this thing any further." Clark testified, "I asked him [defendant] if that meant there would not be a prosecution, and he winked at me and sort of pushed me a little, and said he thought it was all taken care of and that I wouldn't have any more problems with Monarch Construction Corporation."

---

6. Although proof of this event was adduced at trial, the court instructed the jury that this was a legislative act which the jury might not consider in deliberating on the question of defendant's guilt.

7. The representative of the Department of Justice testified that defendant made no "improper" requests to him in connection with the meeting. In view of our concept of the scope of the "speech or debate" clause, and the protection that defendant was entitled to claim thereunder, this testimony is not significant.

8. These officials also testified that defendant asked nothing "illegal or improper" of them. But, as will be later shown, proof of the substance of the discussion transgressed the "speech or debate" clause even if it was exculpatory.

Cohen and defendant had no further communication until 1967, when Cohen became aware that a federal grand jury in the District of Columbia was investigating Monarch for possible postal violations. Defendant assured Cohen that he would not be indicted, since "the last thing the Government did before it dropped the case was to give it to the Post Office Department." In 1968, a special federal grand jury was impaneled in Washington to investigate certain home improvement frauds. Cohen, in May 1969, learned that Monarch was a prime target and he and Clark again sought defendant's help. At first, defendant said that he could not help due to the change in administrations. But when Clark offered defendant $5,000 if no criminal prosecution resulted, defendant agreed to help. Defendant referred Cohen to a Washington attorney who was a good friend of the prosecutor and who, it was represented, could "take care of the problem." They consulted the attorney, who said that he could fix the case for a fee of $30,000. At Cohen's request, defendant met with the attorney and the prosecutor, and then reported that "he was confident that it could be handled this way, that he was sure there would be no prosecution." Cohen made a partial payment of the agreed amount and six months passed without incident.

Then, Cohen became the subject of an unrelated federal investigation in Maryland. Cohen reached an understanding with the United States Attorney for the District of Maryland pursuant to which Cohen disclosed the nature and details of his relationship with defendant in exchange for immunity. On January 20, 1970, Cohen had a conversation with defendant in defendant's office in Washington, which Cohen recorded without defendant's knowledge. Defendant was a party to a number of statements, some of which were made by him and some of which were made to him. When defendant appeared voluntarily before the federal grand jury in Baltimore on March 4, 1970, he flatly denied under oath either making or being a party to them. These statements served as the basis for perjury counts six, seven and eight of the indictment: defendant's representation to Cohen that he had told Clark in 1965 that Cohen's problems would have to be "handled" in some way other than Congressional immunity and that had it not been for defendant's efforts Cohen would probably have already been prosecuted; Cohen's representation to defendant that Cohen had paid defendant $25,000 in 1965 and that this payment had "done its job;" and defendant's representation to Cohen that defendant would try to learn the status of the Monarch investigation and defendant's expressed hope that he could "do something" for Cohen about it.

Perjury counts four and five were based upon defendant's denial under oath before the federal grand jury that he had met Clark in the airport in Atlanta, Georgia, and that he had received any monies for or on behalf of Cohen or Monarch other than an honorarium of $500 for making the June 1, 1965 speech.

## II.

■ The speech or debate clause on which defendant's first principal contention is grounded, was adopted by the Constitutional Convention without debate or opposition.[9] Its roots lie in the conflict between Parliament and the Crown,[10] and that experience has taught that:

> In order to enable and encourage a representative of the public to dis-

9. See 5 Debates on the Federal Constitution 406 (J. Elliot ed. 1876); 2 Records of the Federal Convention of 1787, p. 246 (M. Farrand rev. ed. 1966).

10. See Cella, The Doctrine of Legislative Privilege of Freedom of Speech and Debate: Its Past, Present and Future as a Bar to Criminal Prosecutions in the Courts, 2 Suffolk L.R. 1, 3–16 (1968); Comment, *Brewster, Gravel,* and Legislative Immunity, 73 Col.L.Rev. 125, 126–29 (1973). See generally C. Wittke, The History of English Parliamentary Privilege (Ohio State Univ. 1921).

charge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of everyone, however powerful, to whom the exercise of that liberty may occasion offence.[11]

To effect this protection, the speech or debate clause not only provides a defense on the merits, but spares the legislator from having to devote his time and efforts to defending himself in court.[12]

The law governing Congressional immunity under the speech or debate clause [13] has been most recently discussed in three cases: United States v. Johnson, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966) (*Johnson II*), aff'g 337 F.2d 180 (4 Cir. 1964) (*Johnson I*), on remand 419 F.2d 56 (4 Cir. 1969) (Johnson III), cert. denied 397 U.S. 1010, 90 S.Ct. 1235, 25 L.Ed.2d 423 (1970); United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); and Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).[14] We shall consider these cases and undertake to apply their holdings to the instant case.

█ In *Johnson II*, the Supreme Court held that the speech or debate clause provided immunity to a Congressman from indictment and trial under a general conspiracy statute for conspiracy to defraud the government where proof of the charge involved inquiry into his motivations for a speech given in the Congress. "The essence of such a charge in this context is that the Congressman's conduct was improperly motivated, and . . . that is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry." 383 U.S. at 180, 86 S.Ct. at 755. The Court ruled that the concept of "legislative act" should be broadly construed to effectuate the purpose of ensuring the independence of the legislature. 383 U.S. at 182, 86 S.Ct. 749, 15 L.Ed.2d 681.[15] But with regard to other counts *charging that Johnson improperly interceded with the executive, the Court stated:* "No argument is made, nor do we think that it could be successfully contended, that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process." 383 U.S. at 172, 86 S.Ct. at 751. The Court did not pass on our holding in *Johnson I* that the evidence of legislative acts improperly admitted with regard to the speech count fatally contaminated Johnson's conviction on the improper attempt to influence the executive counts.[16] On re-

---

11. 2 Works of James Wilson (Andrews ed. 1896) 38, as quoted in Tenney v. Brandhove, 341 U.S. 367, 373, 71 S.Ct. 783, 786, 95 L.Ed. 1019 (1951).

12. Powell v. McCormack, 395 U.S. 486, 502–503, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Dombrowski v. Eastland, 387 U. S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967); Doe v. McMillan, 459 F.2d 1304 (D.C.Cir.), cert. granted 408 U.S. 922, 92 S.Ct. 2505, 33 L.Ed.2d 332 (1972).

13. See Comment, 73 Col.L.Rev. 125, supra, n. 10; Note, The Bribed Congressman's Immunity from Prosecution, 75 Yale L.J. 335 (1965); Cella, 2 Suffolk L.R., supra, n. 10. See also Yankwich, The Immunity of Congressional Speech—Its Origin, Meaning and Scope, 99 U.Pa.L.Rev. 960 (1951).

14. The district court's decision preceded the Supreme Court's decisions in *Brewster* and *Gravel*.

15. See Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1881); Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Coffin v. Coffin, 4 Mass. 1 (1808).

16. The government sought and obtained a writ of certiorari extending to this aspect of our decision as well as to the proper scope of the speech or debate clause. In its brief before the Supreme Court, the point was scarcely mentioned; in oral argument, it was abandoned. As a consequence, it was not reviewed by the Supreme Court. *Johnson II*, 383 U.S. at 185–186, 86 S.Ct. 749, 15 L.Ed.2d 681. See also the discussion and implied criti-

mand, the district court dismissed the substantive count based upon delivery of the speech, but convicted Johnson on the improper influence counts; and we affirmed in *Johnson III*. In short, under *Johnson II,* the speech or debate clause does not bar a prosecution founded on a general criminal statute which "does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them." 383 U.S. at 185, 86 S.Ct. at 758. The Court expressly reserved whether the speech or debate clause barred a prosecution "entailing inquiry into legislative acts or motivations . . . founded upon a narrowly drawn statute passed by Congress in the exercise of its legislative power to regulate the conduct of its members." 383 U.S. at 185, 86 S.Ct. at 758.

*Brewster* held that the speech or debate clause did not compel dismissal of an indictment for bribery, even though the *quid pro quo* for the bribe was a patently legislative act, since it would not be necessary for the government to inquire into legislative acts or their motivations—"to inquire into how [Brewster] spoke, how he debated, how he voted, or anything he did in the chamber or in committee"—in order to prove a violation of the bribery statute. 408 U.S. at 526, 92 S.Ct. at 2544. Thus, *Brewster* invoked and applied the first exception articulated in *Johnson II*: prosecution under a general statute which does not draw into question the Congressman's legislative acts or motivations. In reaching this conclusion, the Court seemingly contracted the broader interpretation of legislative act apparently advanced in *Johnson II*.[17] *Brewster* defined protected legislative acts as "an act generally done in Congress in relation to the business before it." 408 U.S. at 512, 92 S.Ct. at 2537. The Court ruled that acceptance of a bribe does not fall within this definition and therefore

judicial inquiry into such receipt would not be an impermissible inquiry into a Congressman's motivation for a legislative act. The Court again expressly reserved the "narrowly drawn statute" exception. 408 U.S. at 529 n. 18, 92 S.Ct. 2531, 33 L.Ed.2d 507.

*Gravel* further elaborated the definition of legislative act as any act constituting "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings . . . with respect to . . . matters . . . within the jurisdiction of either House." 408 U.S. at 625, 92 S.Ct. at 2627. Particularly pertinent here is its holding that the speech or debate clause protects a Congressman from inquiry "except as it proves relevant to investigating possible third party crime, concerning any act, in itself not criminal, performed by [him] . . . in the course of [his] employment, *in preparation for the subcommittee hearing.*" 408 U.S. at 629, 92 S.Ct. at 2629 (emphasis added).

### III.

Defendant contends that under these cases, the various counts of the indictment and a substantial part of the government's proof offered thereunder offended the speech or debate clause and transgressed defendant's immunity in that regard.

■■ A. *The Indictment.* If the indictment is read standing alone, we think its various counts are unobjectionable, with the sole exception of overt act 19 of the first two counts of the indictment. Overt act 19 charges that defendant caused to be issued a subpoena to the District of Columbia Department of Licenses and Inspections commanding the production of certain documents before defendant's subcommittee. Although counts one and two do allege

cism of the government's conduct in the dissenting opinion of Chief Justice Warren, *Johnson II*, 383 U.S. at 186–189, 86 S.Ct. 749. The Chief Justice, joined by Mr. Justice Douglas and Mr. Justice

Brennan, would have reversed us on this point and reinstated the convictions on the substantive improper attempt to influence counts.

17. See 73 Col.L.Rev., supra n. 10, at 146.

(overt act 5) that Monarch made a complaint to the full committee, the other overt acts do not spell out that its chairman designated defendant's subcommittee to investigate it. The only fair inference that can be drawn from the statement of overt act 19 is that defendant was alleged to have performed a legislative act, because, absent an allegation that procurement of a subpoena was fraudulently obtained, we can infer that the subpoena was issued for some purpose of the subcommittee. *Gravel* teaches that inquiry concerning the business of a subcommittee, irrespective of the motives and purposes of a member thereof, is forbidden by the speech or debate clause because it is as much a legislative act as a speech on the floor of the House or a vote on pending legislation.[18] See also *Brewster,* 408 U. S. at 525, 92 S.Ct. at 2544 ("acts which occur in the regular course of the legislative process"); Dombrowski v. Eastland, 387 U.S. 82, 84–85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (Per Curiam); Tenney v. Brandhove, 341 U.S. 367, 376–378, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Doe v. McMillan, 459 F.2d 1304, 1311–1314 (D.C.Cir.), cert. granted 408 U.S. 922, 92 S.Ct. 2505, 33 L.Ed. 2d 332 (1972).

■■ However, if the speech or debate clause, as interpreted by *Johnson II, Brewster* and *Gravel,* is to be given meaning, the validity of an indictment must be determined in the context of the proof which is offered to sustain it, or in the context of facts adduced on a motion to dismiss it. Otherwise, the validity of an indictment would depend solely on what the prosecutor elected to allege, and he would be limited only by his sense of self-restraint in alleging all facts, including those unfavorable to his case. Since the cases make clear that the clause protects against the burden of defending,[19] as well as creates a substantive defense, we think that the speech or debate clause constitutes a limitation on what may be alleged as well as what may be proved, although it may be necessary to go beyond the indictment to obtain the full meaning of what appear facially to be perfectly proper allegations.

■ Specifically, overt acts 20–23 fall into this category. Overt act 20 alleged that the defendant requested that an Assistant United States Attorney meet with him; overt act 21 alleged the fact of the meeting; overt act 22 alleged defendant's meeting with officials of FHA and HHFA; and overt act 23 alleged the receipt and acceptance of documents from officials of FHA and HHFA. The indictment nowhere alleged that defendant was chairman of a subcommittee which was assigned the investigation of Monarch's complaint to determine if formal hearings should be held, or that defendant conferred with various officials and obtained various government documents in regard to other investigations of Monarch's affairs, or that these conferences and the obtention of these documents were, at least arguably, the performance of defendant's legislative functions. Absent such allegations or proof of them, overt acts 20–23 are plainly proper under *Johnson II,* for they can be read as charging that the defendant improperly attempted to influence the executive branch. But when these overt acts are read in the light of the facts adduced at trial, then it is evident that these same overt acts might be interpreted as preparation for a subcommittee hearing on Monarch and, as such, would be protected legislative acts under *Gravel.* When we read overt acts 20–23 in the light of the proof at trial, we con-

---

18. "The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with re-

spect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.
*Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627."

19. See n. 12, supra.

clude that they transgress the speech or debate clause, as we shall discuss further.

■ However, it does not follow that counts one and two should be dismissed because of the inclusion of this improper matter. Rather, the offending overt acts could have been stricken and the counts would still be legally sufficient since 18 U.S.C.A. § 371 requires, in addition to an agreement to commit any offense against the United States, only that "one or more of such persons do *any* act to effect the object of the conspiracy . . ." (emphasis added).

■ Otherwise, the various counts of the indictment are not barred by the speech or debate clause. Under *Johnson II* and *Brewster,* the speech or debate clause does not bar an indictment under a general statute where the government can make a prima facie case without inquiring into legislative acts. It follows that the speech or debate clause did not bar count one, as modified, since the government can show that defendant conspired to receive compensation in relation to a legislative proceeding without proving defendant's efforts to influence the outcome of the proceeding. Similarly, it did not bar count three, since the government could show that defendant traveled across state lines to accept money for an act to be performed without proving that he later performed the act. Likewise, the perjury counts are not barred, because the government could prove perjury without reference to any legislative acts. Since count two (obstruction of justice), as modified, count four (perjury regarding the meeting at the Atlanta Airport), and count five (perjury regarding the acceptance of money at the Atlanta Airport) would not require inquiry into legislative acts and motivations to show guilt thereunder, these counts do not transgress the speech or debate clause.

B. *The Proof.* While we conclude that none of the various counts were barred in their entirety by the speech or debate clause, we view the evidence offered at trial differently. The proof fell into three general categories: (1) defendant's conversations and arrangements with Clark and Cohen, (2) his grand jury testimony, and (3) his conversations and arrangements with the United States Attorney, FHA and HHFA concerning Monarch. In connection with the last category, a considerable amount of documentary evidence of reports of investigations which defendant and Garber obtained was admitted into evidence.

■ We have no doubt that evidence falling into the first two categories was not barred by the speech or debate clause. With respect to the first category, *Brewster* ruled that the government may allege and prove that a Congressman "solicited, received, or agreed to receive, money with knowledge that the donor was paying him compensation for an official act." 408 U.S. at 527, 92 S.Ct. at 2545. With regard to the second category, since voluntary testimony before a federal grand jury is not "an act generally done in Congress in relation to the business before it," it follows that the government may allege and prove facts concerning such testimony. 408 U.S. at 512, 92 S.Ct. at 2537.

■ But, we are equally firm in our conclusion that evidence falling into the third category was barred. This evidence was an examination of defendant's actions as a Congressman, who was chairman of a subcommittee investigating a complaint, in gathering information in preparation for a possible subcommittee investigatory hearing. As such, it was an examination of legislative acts, as defined by *Gravel,*[20] and is

20. Much of our analysis with respect to the indictment and the proof is premised on the holding in *Gravel* that the speech or debate clause bars inquiry into a Congressman's preparation for a subcommittee hearing. 408 U.S. at 628–629, 92 S.Ct. 2614, 33 L.Ed.2d 583. *Gravel* articulated two exceptions to this rule. Inquiry would be permissible: (a) "[if] it proves relevant to investigating possible

condemned by *Johnson II* and *Brewster* when the prosecution proceeds under a statute of general application. It was a complete disclosure of all that transpired including proof of documents that were obtained and, hence, was a general inquiry into the legislative acts of a Congressman and his motives for performing them.

We conclude that the proof was not received in a prosecution under a narrowly drawn statute, a possible exception suggested by *Johnson II*, 383 U. S. at 185, 86 S.Ct. 749, 15 L.Ed.2d 681, and *Brewster*, 408 U.S. at 529 n. 18, 92 S.Ct. 2531, 33 L.Ed.2d 507. Of course, what is a "narrowly drawn statute passed by Congress in the exercise of its legislative power to regulate the conduct of its members," *Johnson II*, 383 U.S. at 185, 86 S.Ct. at 758, is defined in neither *Johnson II* nor in *Brewster*. In the instant case, the government concedes, with respect to count two, that neither the underlying obstruction statute nor the conspiracy statute qualify as narrowly drawn statutes. It argues, however, with respect to count one, that the object of the conspiracy was to violate a narrowly drawn conflict of interest statute, that, with respect to count three, the object of the interstate travel was to violate a narrowly drawn bribery statute, and that in both counts the narrowly drawn underlying statutes determine the nature of the prosecution notwithstanding that the conspiracy and the interstate travel statutes are general in nature.

We cannot agree that the statutes underlying counts one and three are "narrowly drawn." The language of the Chief Justice writing for the Court in *Brewster*, in which the suggestion in *Johnson II* was given continued life,

was: "we express no views on the question left open in *Johnson* as to the constitutionality of an inquiry that probes into legislative acts or the motivation for legislative acts if Congress specifically authorizes *such* in a narrowly drawn statute." 408 U.S. at 529, 92 S. Ct. at 2546. (Emphasis added.) We read the Court to be saying that if Congress, in recognition that either House is ill-equipped to conduct a trial, or that a trial interferes unduly with other legislative business, or for any other reason, concludes to permit judicial inquiry into legislative acts or motivations to relieve itself of that burden, it will do so in clear and unmistakable language. In short, there must be a specific and express delegation of authority to inquire into legislative acts or motivations. Both the conflict of interest statute and the bribery statute, although they are applicable to Congressmen and others, are lacking in an express delegation of this nature. Although Congress explicitly authorized the executive and judicial branches to prosecute Congressmen under these statutes, there is no specific expression of intent on the part of Congress that these prosecutions be allowed to proceed beyond the bounds of *Johnson II* and *Brewster* by probing into legislative acts and the motivations therefore. Since the speech or debate clause so clearly vests the authority to make such an inquiry exclusively in Congress, delegation of that power is not to be implied. And there is no need, as we show elsewhere in this opinion, to imply the power in order to give meaning and make effective the statutes underlying counts one and three.

We therefore conclude that the speech or debate clause as interpreted in *Johnson II*, *Brewster*, and *Gravel* prohibited this proof.

third party crime," and (b) if the Congressman's act is itself criminal. 408 U.S. at 629, 92 S.Ct. at 2629. Although these exceptions, if read literally, might conceivably be applied in this case, we conclude that the context in *Gravel*— alleged theft and receipt of stolen classified papers—limits their application to

cases where the inquiry focuses on the manner and methods of obtaining certain information, and not to cases where the inquiry focuses on the Congressman's motivations for obtaining certain information. Otherwise, these exceptions would engulf the rule.

Of course, defendant's actual motives in communicating with various government officials and in obtaining certain government documents could have been, as the government contends, for improper non-legislative purposes. But we reject the government's argument that it was proper for the jury to receive all of the evidence and to pass upon the issue of what activities were legislative, protected from examination by the speech or debate clause, and what were not. In the first place, the government's argument is nothing more than a *post hoc* justification of what was done; the case was not tried on the theory which is now urged. Other than to be told to disregard proof of overt act 19 in arriving at a verdict on counts one and two of the indictment, the jury was not told how to weigh and consider the evidence before it. It was not instructed to consider first admissibility and, only if it concluded that the evidence was admissible under standards stated by the court, to consider the evidence on the issue of guilt or innocence. Rather, it was free to consider the evidence in arriving at its verdict irrespective of whether it concluded that defendant was performing a legislative act.

█ Secondly, the question of admissibility of evidence is generally a question solely for the court. IX Wigmore, Evidence § 2550 (3d ed. 1940); McCormick, Evidence § 53 (2d ed. Cleary 1972). See Rule 26, F.R.Cr.P. This salutary rule undoubtedly stems, in part, from general recognition of the difficulty that a juror, untrained in the law, may have in divorcing from his mind the probative value of the evidence even if, under proper instruction, he concludes that it was inadmissible. See *Johnson I*, 337 F.2d at 204. Cf. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

█ But, an even more basic flaw in the government's argument is its implied assertion concerning the scope of protection afforded by the speech or debate clause; namely, that it is applicable only when a pure legislative motive is present. The clause does not simply protect against inquiry into acts which are manifestly legislative. In our view, it also forbids inquiry into acts which are purportedly or apparently legislative, even to determine if they are legislative in fact. Once it was determined, as here, that the legislative function (here, full investigation of the Monarch complaint to determine if formal subcommittee hearings should be held) was *apparently* being performed, the propriety and the motivation for the action taken, as well as the detail of the acts performed, are immune from judicial inquiry. In Tenney v. Brandhove, 341 U. S. 367, 377–378, 71 S.Ct. 783, 788 (1951), it was pointed out:

> The claim of an unworthy purpose does not destroy the privilege . . .. The privilege would be of little value if they [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives . . .. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province.

See Coffin v. Coffin, 4 Mass. at 27; Doe v. McMillan, 459 F.2d at 1312–1313.

█ We are not impressed by the government's argument that a consequence of our holding will be that dishonest Congressmen will evade prosecution by creating a smokescreen of arguably legislative activity to camouflage illegal non-legislative acts. Constitutionally permissible sanctions are available: Under *Johnson II* and *Brewster*, the government can go far in indicting and proving a case of criminal conspiracy and other substantive offenses without alleging or proving that the illegal objectives of the conspiracy were fully realized by the Congressman. Congress may have the right to enact a narrowly drawn statute proscribing the illegal

conduct. *Johnson II*; *Brewster*. In any event, the House or Senate clearly has jurisdiction to try any member who is a wrongdoer and punish him for his derelictions.

## IV.

Having concluded that evidence was adduced at trial and considered by the jury in violation of the speech or debate clause, we turn to a consideration of the effect on each of defendant's convictions. The most pertinent authority to be considered is *Johnson I*. There, where Johnson was indicted for conspiracy and for substantive offenses which were the objects of the conspiracy, we held that evidence violative of the speech or debate clause fatally infected the jury's consideration of Johnson's guilt or innocence of the substantive offenses with which he was charged. 337 F.2d at 204.[21] Our conclusion was based upon our notions of fairness and prejudice to Johnson, and it did not stem from considerations of constitutional law.

■ It is manifest that defendant's convictions under the conspiracy counts one and two must be reversed, since the proof to support them included, in our view, clear violations of the speech or debate clause. But as to them, since the essence of the offenses charged was an illegal *agreement* to accomplish illegal objectives, guilt could be established by proof of the agreement, accompanied by proof of one or more non-legislative overt acts to carry it out, without proof of legislative acts immunized from inquiry by the speech or debate clause. It follows that the government should be afforded the right of retrial. See *Brewster*.

■ The same is true with regard to the count charging interstate travel to commit bribery (count three). The erroneously admitted evidence of legislative acts was arguably relevant to proof of bribery, and we *cannot confidently* say that the jury did not consider it in finding guilt. Moreover, the travel count arose from an alleged conspiracy to accomplish certain illegal legislative acts, and was tried in the context of prohibited disclosure of those legislative acts. We can only conclude, on the authority of *Johnson I*, that the violation of the speech or debate clause so tainted the trial of this substantive count that defendant's conviction on it should be set aside. Since count three could be proved without reference to legislative acts, a new trial will be awarded.

■ With respect to counts four and five, alleging perjury in defendant's denial of the meeting in the Atlanta Airport and his receipt of $25,000, we conclude once again that the erroneously admitted evidence of legislative acts fatally infected the convictions. The evidence on these counts was sharply conflicting. Unrestricted by any limiting instruction, the jury, in passing upon the credibility of the government's witnesses, was permitted to rely upon evidence of legislative acts to conclude that the meeting and delivery of the money had occurred and, hence, that the denials were willful material untruths. Since we cannot say that the jury did not, defendant's convictions on counts four and five should be set aside; but since these counts could have been proved without reference to legislative acts, a new trial will be awarded.

■ The remaining perjury convictions (counts six–eight) stand on a different footing. These counts allege perjured denials of statements made in recorded or transcribed conversations with Cohen. Defendant's guilt or innocence of them depended in no part upon the accuracy of the statements he made to Cohen in defendant's office in Washington, or upon the accuracy of what Cohen said to him at that time in that place. Rather, his guilt or innocence depended solely upon whether, when he denied what he and Cohen had said before the Maryland federal grand jury, his de-

---

21. See n. 16 for the history of this holding. We would be less than candid if we did not state that we think its correctness has been severely shaken.

nial was a willful untruth.[22] Because the earlier conversations had been taped and the grand jury testimony stenographically reported, the evidence to show guilt on these counts was overwhelming. Unlike counts four and five, the falsity of the denials before the Maryland federal grand jury was beyond dispute. The sharp juxtaposition of defendant's baldly conflicting statements after he had been given every opportunity before the grand jury to tell the truth not only proved willfulness, but made slight the possibility that the jury had resort to the erroneously admitted evidence of legislative acts. The instant case is quite unlike United States v. Beach, 296 F.2d 153 (4 Cir. 1961), because Beach did not prescribe an inflexible rule and the rule of Beach should not be applied where the types of perjury are clearly different, where the proof as to some is overwhelming, and where the likelihood that a defendant was prejudiced because a jury was permitted improperly to conclude guilt on some was highly remote. Thus, while we conclude that it might have been preferable for defendant to have been tried on perjury counts six–eight under laboratory conditions which excluded any disclosure of legislative acts, we cannot say that there was sufficient prejudice to defendant by their disclosure to warrant overturning these convictions.

## V.

Because we deem the perjury convictions on counts six–eight otherwise valid, we are brought to the question of whether certain tapes and transcriptions of defendant's conversations with Cohen, including the one which occurred in defendant's office in Washington on January 20, 1970, were illegally obtained so as to render them inadmissible in evidence and whether there was any other ground of illegality in the use of this evidence in obtaining these convictions. First, it is necessary to state additional facts:

Cohen made his arrangement with the United States Attorney for the District of Maryland to make a full, truthful disclosure of his dealings with defendant in exchange for immunity on December 30, 1969. Thereafter, he embarked upon a program of active cooperation with the United States Attorney and the FBI.

On January 12, 1970, he placed a long distance call from Baltimore to defendant's office in the District of Columbia. With Cohen's consent, the call was monitored by an agent of the FBI, but it was not recorded. Cohen was unable to reach defendant, but he obtained several telephone numbers where defendant could be reached.

The following day, attorneys for the government sought and obtained an order from the United States District Court for the District of Maryland authorizing the FBI to intercept "by means of electronic devices to be placed, with the consent of Nathan Cohen, on his person and on telephones utilized by him, conversations, telephonic or in person . . ." between Cohen and defendant. The order was limited to a ten-day

22. The jury was fully and correctly instructed as to the law of perjury. Although the district court instructed the jury to apply the rule requiring a witness and corroboration—the "two-man" rule—with respect to perjury, notwithstanding that there was a record of what defendant had said on each of two occasions (cf. United States v. Wood, 14 Pet. 430, 437, 441, 10 L.Ed. 527 (1840)), the jury's attention was directed to the tapes and transcriptions of the conversations with Cohen and to the transcript of the grand jury testimony. The jury was told to convict only if they found be- yond a reasonable doubt that the grand jury testimony was a willful material untruth. Additionally, the jury was told that each count of the indictment charged a separate offense and that "[e]ach charge and the evidence pertaining to it should be considered separately. The fact that you may find the accused guilty or not guilty as to one of the offenses charged should not control your verdict as to any other offense charged." As stated in the text, we think that under the circumstances of this case the quoted language should be given greater effect than in United States v. Beach, supra.

period. As soon as the order was obtained, Cohen placed a call to defendant in Texas from the offices of the FBI in Baltimore and, with Cohen's consent, their conversation was electronically recorded by the FBI on a cassette recorder. This recording was subsequently admitted into evidence.

On January 19, 1970, Cohen placed a telephone call to defendant's office in the District of Columbia. The call originated in Baltimore and, again with Cohen's consent, the conversation was electronically recorded. This recording was also admitted into evidence. During the conversation between the two, Cohen made an appointment to see defendant in the latter's office in Washington on the next day, January 20.

At the January 20, 1970 meeting, Cohen had permitted the placement on his person of a recording device and the entire conversation between the two was recorded. Subsequently, the recording was transcribed and both the recording and the transcription were admitted into evidence.

On January 22, 1970, the government sought and obtained another order from the district court, again authorizing the use of electronic devices to be placed, with the consent of Cohen, on his person and on telephones utilized by him to record conversations between him and defendant. On January 28, after the entry of the second order, Cohen placed a final call from Baltimore to defendant in the latter's office in the District of Columbia, and with Cohen's consent this conversation was electronically recorded. This recording and a transcript of the conversation were also admitted into evidence.

■ Defendant's first claim with respect to the recordings and the transcriptions is that his rights under the fourth amendment were violated. We think the complete answer to this contention is United States v. White, 401 U. S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (plurality opinion), which held that the fourth amendment requires no prior judicial authorization for governmental electronic recording of a private conversation where one of the parties to the conversation has consented to the surveillance. Since Cohen consented to each recording, it follows that each recording and the transcriptions made from some did not violate defendant's fourth amendment rights and were therefore admissible into evidence.

It also follows that we need not consider the validity of the court orders authorizing the recordings. They were sought and obtained prior to the decision in *White*, undoubtedly as a precautionary measure on the part of the government. Since *White* makes clear that no warrant or order is needed, any discussion of whether the district court in Maryland may authorize the recording of a conversation with a party in the District of Columbia or in Texas would be academic.

■ We reject defendant's argument that Cohen's consent was not freely and voluntarily given since it was extended under the pressure of a potential indictment and in return for a promise of immunity. Three circuits have rejected this argument, United States v. Silva, 449 F.2d 145, 146 (1 Cir. 1971), cert. denied 405 U.S. 918, 92 S.Ct. 942, 30 L. Ed.2d 787 (1972); United States v. Jones, 433 F.2d 1176 (D.C. Cir. 1970), cert. denied 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1951); Good v. United States, 378 F.2d 934, (9 Cir. 1967), and we agree. United States v. Laughlin, 226 F.Supp. 112 (D.D.C.1964) cited by defendant, which holds to the contrary, has been superseded by United States v. Jones, supra.

■ Defendant cites no authority, and we are aware of none, indicating that the recording and transcription of a Congressman's conversations violate the constitutional principle of the separation of powers. We also reject defendant's suggestion that in the exercise of our supervisory power over district courts we should suppress consensual electronic surveillance as "dirty business." Cf.

McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). The Supreme Court has considered and rejected this very argument on at least two occasions. Lopez v. United States, 373 U.S. 427, 440, 83 S.Ct. 1381, 10 L. Ed.2d 462 (1963); OnLee v. United States, 343 U.S. 747, 754–758, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). See also Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966).

■■■■■ Finally, we have examined the record in detail and we can find no support for defendant's argument that he was entrapped by the United States Attorney in testifying before the grand jury, where he denied the conversations which had been recorded. The essence of the crime of perjury is a willful untruth, under oath, in a material statement. While the United States Attorney, by inviting defendant to testify before the grand jury, may have provided defendant with the opportunity to commit perjury, the record is absolutely devoid of any evidence that the United States Attorney suggested what defendant should say when he testified. Legally, as well as factually, there was no entrapment. Certainly there was no obligation on the part of the United States Attorney to advise the defendant of evidence which the former had in his possession or of which he was aware. See United States v. Winter, 348 F.2d 204 (2 Cir.), cert. denied 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965); LaRocca v. United States, 337 F.2d 39 (8 Cir. 1964).

Reversed as to counts One through Five and new trial granted; affirmed as to Counts Six through Eight.

## APPENDIX

### COUNT ONE

The first count of the indictment and the new matter alleged in the second count read as follows:

The Grand Jury for the District of Maryland charges:

1. At all times hereinafter mentioned, JOHN DOWDY was a Member of the House of Representatives of the United States of America. He represented the Seventh Congressional District of Texas in the Eighty-Second through the Eighty-Ninth Congresses and represented the Second Congressional District of Texas in the Ninetieth and Ninety-First Congresses.

2. At all times hereinafter mentioned, the Department of Justice was a Department of the United States, created, organized and existing by virtue of Chapter 150 of 16 Stat. 162, entitled "An Act to establish the Department of Justice," enacted by the Congress of the United States on June 22, 1870, and charged with the responsibility of enforcing the laws of the United States.

3. Monarch Construction Corporation was a Maryland corporation with offices at 10111 Colesville Road, Silver Spring, Maryland from on or about May 1, 1963 to on or about October 5, 1965.

4. MYRVIN C. CLARK was Sales Manager of Monarch Construction Corporation from on or about May 1, 1963 to on or about October 5, 1965.

5. Nathan H. Cohen was President of Monarch Construction Corporation from on or about May 1, 1963 to on or about October 5, 1965.

6. From on or about August 1, 1965 to on or about December 10, 1969,

JOHN DOWDY
and
MYRVIN C. CLARK

herein named as defendants, together with Nathan H. Cohen, herein named as a co-conspirator but not indicted, and with other persons, did unlawfully, willfully and knowingly combine, conspire, confederate and agree together and with each other within the State and District of Maryland and elsewhere to commit offenses against the United States, to wit, that otherwise than as provided by law for the proper discharge of official duties, JOHN DOWDY would, directly and indirectly, receive from Nathan H. Cohen and MYRVIN C. CLARK, and Nathan H. Cohen and MYRVIN C.

CLARK would knowingly, directly and indirectly, give to JOHN DOWDY, compensation for services rendered by JOHN DOWDY and others in relation to a proceeding, request for a determination, controversy, charge, accusation and other particular matter in which the United States was a party and had a direct and substantial interest, before a department, agency and officer; said proceeding was an investigation then pending before the Department of Justice, and in the office of the United States Attorney for the District of Columbia, concerning possible violations of criminal statutes of the United States and the District of Columbia by Monarch Construction Corporation, Nathan H. Cohen, MYRVIN C. CLARK and others associated with the business and affairs of Monarch Construction Corporation; all in violation of Sections 203(a) and (b) of Title 18 of the United States Code.

### OVERT ACTS

In pursuance of and in order to effect the objects of the aforesaid conspiracy, the defendants and co-conspirators did do and perform numerous overt acts, including the following, to wit:

(1) Between on or about August 1, 1965 and on or about September 22, 1965, in the District of Maryland, the defendant MYRVIN C. CLARK and Nathan H. Cohen met and agreed that the defendant MYRVIN C. CLARK would approach the defendant JOHN DOWDY with the suggestion that the defendant JOHN DOWDY arrange for Nathan H. Cohen to appear before a Congressional committee, testify concerning his relationship to the business and affairs of Monarch Construction Corporation and thereby gain immunity from prosecution.

(2) Between on or about August 1, 1965 and on or about September 22, 1965, in the District of Columbia, the defendant MYRVIN C. CLARK and the defendant JOHN DOWDY met and discussed the possibility of the defendant JOHN DOWDY, in return for a payment to the defendant JOHN DOWDY of $25,000, assisting Nathan H. Cohen in securing immunity from prosecution by testifying before a Congressional committee.

(3) Between on or about August 1, 1965 and on or about September 22, 1965, in the District of Maryland, the defendant MYRVIN C. CLARK met with Nathan H. Cohen and reported to him concerning the meeting and discussion between the defendant MYRVIN C. CLARK and the defendant JOHN DOWDY described in Overt Act (2) above.

(4) Between on or about August 1, 1965 and on or about September 22, 1965, in the District of Columbia, the defendant JOHN DOWDY and Nathan H. Cohen met and agreed that the defendant JOHN DOWDY, in return for a payment to the defendant JOHN DOWDY of $25,000, would arrange for Nathan H. Cohen to appear before a Congressional committee and testify concerning Nathan H. Cohen's relationship to the business and affairs of Monarch Construction Corporation.

(5) On or about September 16, 1965, in the District of Columbia, Nathan H. Cohen caused a letter, with enclosures, to be sent to the defendant JOHN DOWDY and other members of the Committee on the District of Columbia of the House of Representatives, charging "persecution", "duress and coercion" and "abuse of authority" allegedly directed against Monarch Construction Corporation, Nathan H. Cohen and others by government officials.

(6) Between on or about August 1, 1965 and on or about September 22, 1965, in the District of Maryland, the defendant MYRVIN C. CLARK had a telephone conversation with the defendant JOHN DOWDY during which arrangements were made to make a payment of $25,000 to the defendant JOHN DOWDY at Atlanta Airport, Atlanta, Georgia.

(7) Between on or about August 1, 1965 and on or about September 22, 1965, in the District of Maryland, the

defendant MYRVIN C. CLARK and Nathan H. Cohen met and discussed the transportation of $25,000 in cash to Atlanta Airport, Atlanta, Georgia.

(8) On or about September 21, 1965, in the District of Maryland, Nathan H. Cohen caused $5,000 to be withdrawn from the Savings Bank of Baltimore in Baltimore.

(9) On or about September 21, 1965, in the District of Maryland, Nathan H. Cohen caused $9,200 to be withdrawn from the Montgomery Savings Association of Kensington, Maryland.

(10) On or about September 22, 1965, in the District of Maryland, Nathan H. Cohen caused $7,000 to be borrowed from the Uptown Federal Savings and Loan Association in Baltimore.

(11) On or about September 22, 1965, in the District of Maryland, Nathan H. Cohen caused $4,200 to be borrowed from the Central National Bank of Maryland.

(12) On or about September 22, 1965, in the District of Maryland, Nathan H. Cohen and others packed $25,000 in cash in a briefcase.

(13) On or about September 22, 1965, in the District of Maryland, Nathan H. Cohen and others prepared a list of serial numbers of paper currency then being packed in the briefcase as described in Overt Act (12) above.

(14) On or about September 22, 1965, in the District of Maryland, the defendant MYRVIN C. CLARK departed for Atlanta, Georgia.

(15) On or about September 22, 1965, in the District of Maryland, Nathan H. Cohen caused the briefcase containing $25,000 in cash, as described in Overt Act (12) above, to be transported from Maryland to Atlanta Airport, Atlanta, Georgia.

(16) On or about September 22, 1965, the defendant JOHN DOWDY travelled from the District of Columbia to Atlanta Airport, Atlanta, Georgia.

(17) On or about September 22, 1965, at Atlanta Airport, Atlanta, Georgia, the defendant MYRVIN C. CLARK transferred possession of the briefcase containing $25,000 in cash, as described in Overt Act (12) above, to the defendant JOHN DOWDY.

(18) Between on or about September 23, 1965 and on or about November 1, 1965, in the District of Columbia, the defendant JOHN DOWDY and Nathan H. Cohen discussed the possibility of the defendant JOHN DOWDY taking steps, other than arranging for the appearance of Nathan H. Cohen as a witness before a Congressional committee as described in Overt Act (4) above, designed to prevent, or to reduce the likelihood of, the prosecution of Nathan H. Cohen.

(19) On or about October 13, 1965, in the District of Columbia, the defendant JOHN DOWDY caused to be issued a subpoena directed to an official of the District of Columbia Department of Licenses and Inspections commanding the production of certain documents before Subcommittee Number 4 of the Committee on the District of Columbia of the United States House of Representatives.

(20) Between on or about October 1, 1965 and on or about October 25, 1965, in the District of Columbia, the defendant JOHN DOWDY caused a request to be made to an Assistant United States Attorney for the District of Columbia to meet with the defendant JOHN DOWDY in his congressional office.

(21) Between on or about October 1, 1965 and on or about October 25, 1965, in the District of Columbia, the defendant JOHN DOWDY met with an Assistant United States Attorney for the District of Columbia in the defendant JOHN DOWDY's congressional office and inquired of him about an investigation then pending before the Department of Justice, and in the office of the United States Attorney for the District of Columbia, concerning possible violations of criminal statutes by Nathan H. Cohen, Monarch Construction Corporation and others.

(22) On or about October 22, 1965, in the District of Columbia, the defendant

JOHN DOWDY met in his congressional office with officials of the Federal Housing Administration (FHA) and discussed with them an investigation which had been conducted by the Housing and Home Finance Agency (HHFA) concerning the Monarch Construction Corporation, Nathan H. Cohen and others.

(23) On or about October 22, 1965, in the District of Columbia, the defendant JOHN DOWDY received and accepted from officials of the FHA, HHFA files reflecting an investigation which had been conducted by HHFA concerning Monarch Construction Corporation, Nathan H. Cohen and others.

(24) Between on or about October 22, 1965 and on or about December 31, 1965, in the District of Columbia, the defendant JOHN DOWDY made available to the defendant MYRVIN C. CLARK the HHFA files referred to in Overt Act (23) above.

(25) Between on or about October 22, 1965 and on or about December 31, 1965, in the District of Maryland, the defendant MYRVIN C. CLARK photocopied the HHFA files referred to in Overt Act (23) above.

(26) Between on or about October 22, 1965 and on or about December 31, 1965, in the District of Maryland, the defendant MYRVIN C. CLARK gave to Nathan H. Cohen photocopies of the HHFA files referred to in Overt Act (23) above.

(27) Between on or about October 13, 1965 and on or about December 31, 1965, in the District of Columbia, the defendant JOHN DOWDY furnished and caused to be furnished to Nathan H. Cohen photocopies of the documents referred to in Overt Act (19) above.

(28) On or about October 25, 1965, in the District of Columbia, the defendant JOHN DOWDY sent a letter addressed to the United States Attorney's office for the District of Columbia.

(29) On or about October 25, 1965, in the District of Columbia, the defendant JOHN DOWDY sent a letter addressed to an official of the FHA.

(30) Between on or about May 1, 1967 and on or about September 1, 1967, in the District of Columbia, the defendant JOHN DOWDY and Nathan H. Cohen met and discussed the status of the investigation then pending in the Department of Justice, and in the office of the United States Attorney for the District of Columbia, concerning possible violations of criminal statutes by Nathan H. Cohen, Monarch Construction Corporation and others.

(31) Between on or about May 1, 1969 and on or about June 5, 1969, in the District of Columbia, the defendant MYRVIN C. CLARK made a telephone call to the defendant JOHN DOWDY.

(32) Between on or about May 1, 1969 and on or about June 5, 1969, in the District of Columbia, the defendants JOHN DOWDY and MYRVIN C. CLARK met with Nathan H. Cohen.

(33) Between on or about May 1, 1969 and on or about June 5, 1969, in the District of Columbia, the defendant MYRVIN C. CLARK discussed with Nathan H. Cohen the payment of $5,000 by and on behalf of Nathan H. Cohen to the defendant JOHN DOWDY.

(34) Between on or about May 1, 1969 and on or about June 6, 1969, in the District of Maryland, Nathan H. Cohen had a telephone conversation with the defendant JOHN DOWDY during which the defendant JOHN DOWDY suggested that Nathan H. Cohen consult with Hugh J. McGee, a Washington attorney.

(35) Between on or about May 1, 1969 and on or about June 6, 1969, in the District of Columbia, Nathan H. Cohen had a telephone conversation with Hugh J. McGee.

(36) Between on or about May 1, 1969 and on or about June 6, 1969, in the District of Columbia, the defendant MYRVIN C. CLARK, Nathan H. Cohen

and Hugh J. McGee met in the office of Hugh J. McGee.

(37) Between on or about May 1, 1969 and on or about June 30, 1969, in the District of Columbia, the defendant JOHN DOWDY and Nathan H. Cohen met and discussed the payment of $5,000 by and on behalf of Nathan H. Cohen to the defendant JOHN DOWDY.

(38) Between on or about May 1, 1969 and on or about June 30, 1969, in the District of Columbia, Nathan H. Cohen met with Hugh J. McGee at the office of Hugh J. McGee.

(39) Between on or about May 1, 1969 and on or about June 30, 1969, in the District of Columbia, Nathan H. Cohen, with the permission of Hugh J. McGee, overheard a telephone conversation between Hugh J. McGee and Oliver O. Dibble, a Department of Justice attorney assigned to the office of the United States Attorney for the District of Columbia.

(40) On or about June 6, 1969, in the District of Columbia, Nathan H. Cohen gave to Hugh J. McGee check No. 1044, dated June 6, 1969, drawn on the Equitable Trust Company, Baltimore, Maryland, payable to Hugh J. McGee in the amount of $2,500.

(41) On or about June 10, 1969, in the District of Maryland, Nathan H. Cohen caused the check described in Overt Act (40) above to be paid by the Equitable Trust Company, Baltimore, Maryland.

(42) Between on or about May 1, 1969 and on or about July 30, 1969, in the District of Columbia, the defendant · JOHN DOWDY met with Nathan H. Cohen.

(43) On or about June 20, 1969, in the State of New Jersey, Nathan H. Cohen sent to Hugh J. McGee check No. 1050, dated June 20, 1969, drawn on the Equitable Trust Company, Baltimore, Maryland, payable to Hugh J. McGee in the amount of $500.

(44) On or about July 1, 1969, in the District of Maryland, Nathan H. Cohen caused the check described in Overt Act (43) above to be paid by the Equitable Trust Company, Baltimore, Maryland.

(45) Between on or about May 1, 1969 and on or about July 30, 1969, in the District of Columbia, the defendant JOHN DOWDY met with Hugh J. McGee and Oliver O. Dibble.

## COUNT TWO

And the Grand Jury for the District of Maryland further charges:

1. The Grand Jury realleges paragraphs (1) through (5), inclusive, of Count One of this indictment and incorporates them herein by reference.

2. From on or about August 1, 1965 to on or about December 10, 1969,

JOHN DOWDY
and
MYRVIN C. CLARK

herein named as defendants, together with Nathan H. Cohen, herein named as a co-conspirator but not indicted, and with other persons, did unlawfully, willfully and knowingly combine, conspire, confederate and agree together and with each other within the State and District of Maryland and elsewhere to commit an offense against the United States, to wit, that JOHN DOWDY would corruptly influence, obstruct, and impede and would corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under which a proceeding was then being had before a department of the United States; said proceeding was an investigation then pending before the Department of Justice, and in the office of the United States Attorney for the District of Columbia, concerning possible violations of criminal statutes of the United States and the District of Columbia by Monarch Construction Corporation, Nathan H. Cohen, MYRVIN C. CLARK and others associated with the business and af-

fairs of Monarch Construction Corporation; all in violation of Section 1505 of Title 18 of the United States Code.

The overt acts then alleged in the second count are identical to those alleged in the first count.

In the third count, defendant, together with Myrvin C. Clark, was charged with traveling in interstate commerce from Maryland to Georgia, and causing to move in interstate commerce between those places the sum of $25,000 in cash, with intent to accomplish the bribery of defendant.

Counts Four through Eight all charged perjury before a Grand Jury for the District of Maryland on March 4, 1970; each count being based upon a separate allegedly material false statement. In Count Four, the actionable statement of defendant was his denial that he met Clark in an airport in Atlanta, Georgia on or about September 22, 1965. Count Five assigned as perjury defendant's denial that he received $25,000 in cash at this meeting with Clark.

Counts Six through Eight assigned as perjury defendant's Grand Jury testimony concerning conversations with Cohen which occurred in January, 1970. Count Six was the denial that defendant had told Clark that Cohen's prospective prosecution would have to be "handled" in a way other than obtaining Congressional immunity for Cohen and that if it had not been for defendant's efforts, Cohen would have already been prosecuted. Count Seven alleged as willfully untrue defendant's denial that Cohen had said to him that defendant had been paid $25,000 by Cohen and that the payment had "done its job." Count Eight alleged as criminally actionable defendant's denial that he had sought to assist Cohen by determining the status of an investigation of Monarch pending before the Department of Justice and in the office of the United States Attorney for the District of Columbia and that he had expressed the hope that he could "do something" for Cohen in regard to the investigation.